**CUMBERLAND FARMS NORTHERN, INC.**

v.

**MAINE MILK COMMISSION and Maine Milk Dealers Association et al. and Yankee Milk, Inc., et al.**

Supreme Judicial Court of Maine.

Aug. 23, 1977.

Preti & Flaherty by David M. Cohen, Harold C. Pachios, Portland, for plaintiff.

Donald G. Alexander, Deputy Atty. Gen., Augusta, for Maine Milk Comn.

Murray, Plumb & Murray by Peter L. Murray, John C. Lightbody, Portland, for Maine Milk Dealers Association.

Lipman, Parks, Livingston & Lipman by John M. Parks, Sumner H. Lipman, Augusta, for Yankee Milk, Inc.

Before DUFRESNE, C. J., and POMEROY, ARCHIBALD, DELAHANTY and GODFREY, JJ.

GODFREY, Justice.

These appeals arise from a decision of the Superior Court holding parts of two minimum pricing orders of the Maine Milk Commission invalid on two grounds; first, that the orders were issued without such an investigation as is required by the 1975 revision of the Maine Milk Commission Law, and second, that the Commission, in establishing minimum prices to be paid to milk dealers, incorrectly applied the pricing standards set forth in that law. The two orders, known as Orders 76–1 and 76–2, purported to establish minimum prices to be paid to producers, dealers and retailers for milk produced, distributed, or sold in Maine.

The Superior Court upheld those provisions of the Commission's orders that adopted as minimum prices to be paid to Maine producers the federally established minimum prices for the Boston Regional Marketing Area. It refused to issue any injunction against the Commission, assuming, without deciding, that the Commission would, pending a new, adequate investigation, "pass through" the valid minimum producer prices under Orders 76–1 and 76–2 and arrive at dealer and retailer minimums by adding the dealer and retailer margins established by the Commission's last valid order preceding 76–1 and 76–2. In that way, the minimum price of milk would remain under control at all levels awaiting the outcome of this appeal.

All parties and intervenors have appealed. The Commission appeals from the Court's invalidation of the dealer and retailer minimums announced in Orders 76–1 and

76–2. The Commission thinks its investigation met statutory requirements and that it applied the statutory pricing standards correctly. The Commission agrees with the court on "passing through" the producer minimums set in those orders if the dealer and retailer minimums must be deemed invalid.

Maine Milk Dealers Association, an intervenor-defendant, agrees with the Commission except that it disapproves "passing through" producer minimums without any hearing if the dealer margins are held invalid.

Cumberland Farms, the plaintiff in Superior Court, agrees with the court's decision that the dealer and retailer minimums are invalid, but argues further that the entire statute is unconstitutional, either on its face or as applied to Cumberland Farms, as a violation of the Commerce and Equal Protection Clauses. It also contends the court erred in denying an injunction.

Yankee Milk, Inc., intervenor-defendant, a producer cooperative, takes essentially the same position as the Commission. It insists strongly that the producer minimums set in Orders 76–1 and 76–2 are valid and should stand unaffected by any illegality of the wholesale and retail minimums.

*The Milk Commission Statute*

The purpose of the original Maine Milk Commission Law, enacted in 1935, was said to be to prevent the disruption of the sale and distribution of milk through unfair, destructive and uneconomic practices. *Maine Milk Comm'n v. Cumberland Farms Northern, Inc.*, 160 Me. 366, 380, 205 A.2d 146, 153 (1964). In the midst of the Great Depression, it was the perception of the legislatures of several states, including Maine, that financially powerful dealers were forcing down the price paid to farmers for milk and were tending to monopolize milk distribution by cutting wholesale prices to drive financially weaker competitors out of business. The 1935 act gave the Maine Commission authority, after investigation and hearing, to set minimum prices to be charged for fluid milk sold within the state by producers, dealers, and retailers. From the beginning of milk price regulation in Maine, sanctions for violation of the Commission's orders have included loss of license, fine, and imprisonment. From the beginning, the Commission has had the power to subpoena witnesses and records in order to administer the act.

Although the Milk Commission Act has been amended repeatedly in minor respects since 1935, the revisions adopted in 1975 must be regarded as of special importance. 1975 Me.P.L. ch. 517, effective October 1, 1975. The most significant changes in 1975 included the following:

1. The composition of the Commission itself was changed. Formerly, representatives of producers, dealers, and retailers were to be appointed as members of the Commission. Since 1975, no member or employee of the Commission may have any business or professional connection with a producer, dealer, or retailer except as a consumer buying at retail. 7 M.R.S.A. § 2952 (Supp.1976).

2. The Commission was given broad powers to inquire into the management of the businesses of producers, dealers and stores, to obtain necessary information. It may require accounts of all milk business, including income, expense, assets and liabilities, to assist it in making its determination of minimum prices, and it must establish by rules and regulations procedures for inspection of records, books, and accounts of producers, dealers and retailers. 7 M.R.S.A. § 2953 (Supp.1976).

3. Not less than once every three years, the Commission must conduct independent studies of the economics and practices of the milk industry to assist the Commission in establishing minimum prices. 7 M.R.S.A. § 2953 (Supp.1976).

4. New criteria were enacted on the basis of which the Commission is to fix minimum prices. Before the 1975 amendments became effective, the Commission established prices on the basis of certain general statutory criteria: the prices were to be just and reasonable "taking into due consid-

eration the public health and welfare and the insuring of an adequate supply of pure and wholesome milk to the inhabitants of this State under varying conditions in various marketing areas, seasonal production and other conditions affecting the costs of production, transportation and marketing in the milk industry, including a reasonable return to the producer and dealer." 7 M.R. S.A. § 2954 (1964). To those general criteria, the 1975 amendment added two others: the Commission must now also take into due consideration prevailing prices in neighboring states and the public need for the establishment of retail milk prices at the lowest practicable levels.

Besides adding the new general criteria to be considered by the Commission in setting minimum prices, the 1975 amendments gave the Commission specific directions in the setting of prices for producers, dealers and stores. The producer price, the price paid to the dairy farmer, must be based on the prevailing price in the southern New England, federally regulated market and must "reflect as accurately as possible the increased costs of production." § 2954.2.A. The so-called dealer margin, the amount added to the producer price to arrive at the wholesale or dealer price, is to "reflect the lowest prices at which milk purchased from Maine producers at Maine minimum prices can be received, processed, packaged and distributed within the State of Maine at a just and reasonable return." § 2954.2.B. The meaning of the quoted language and the necessity and scope of investigation required to arrive at the dealer margin are at issue on this appeal. The retail margin is the third element in the minimum retail price. It is to be "based on the minimum wholesale price paid to dealers and a rate of return deemed just and reasonable by the Maine Milk Commission." § 2954.2.C. The justice and reasonableness of the retailers' rate of return established by the Commission in Orders 76–1 and 76–2 are not at issue here. The minimum retail price established by the Commission's orders has been challenged, rather, on the ground that the dealer margin, to which the retailer's rate of return has been applied, was itself improperly set by the Commission. It is the Commission's method of setting the dealer margin, rather than the retailer's rate of return as such, that was challenged in the proceeding in Superior Court and which presents the crucial issue on this appeal.

## The Procedure

After several days of hearings in October, November and December, 1975, the Commission promulgated its first order under the revised law on December 30, 1975, effective January 1, 1976. That order, Order 76–1, set minimums in the three categories described above. The Maine milk dealers petitioned for reconsideration, alleging that the minimum prices set in Order 76–1 would result in losses to them, and, after two days of hearings in February, the Commission issued Order 76–2 on February 4, 1976, to be effective February 9, 1976, setting higher minimum dealer and retailer prices.

Cumberland Farms Northern, Inc. (hereinafter "Cumberland Farms") appealed each order to the Superior Court under M.R.Civ.P., Rule 80B. The Maine Milk Dealers Association and Yankee Milk, Inc. joined in both appeals as intervenor-defendants. After a hearing, the court reversed both orders to the extent they set minimum dealer and retail prices, on the ground that the Commission had made an insufficient investigation and had applied an incorrect standard in arriving at the minimum prices. The Superior Court declined to address the issues of the constitutionality of the Commission's application of the statute and the sufficiency of the evidence to support the orders, but it sanctioned the Commission's action of automatically "passing through" producer price changes, based on changes in the federally established producer minimums in Boston, without changing dealer and retail margins. Finally, the court denied injunctive relief to Cumberland Farms, saying there had been no showing that such an extraordinary remedy against a state agency was called for in the circumstances or that the Commission would attempt to enforce an order held by the court to be invalid.

The issues presented for our review are the following:

(1) Whether the Commission was required to carry out an investigation of costs in the Maine milk industry before promulgating orders changing the dealer and retail margins and, if so, what the proper scope and nature of the required investigation should be;

(2) Whether the statute authorizing the Commission to set minimum wholesale prices "to reflect the lowest prices at which milk purchased from Maine producers at Maine minimum prices can be received, processed, packaged and distributed within the State of Maine at a just and reasonable return" requires the minimum wholesale prices for different classes of milk to be established in terms of the lowest costs achievable in Maine or the lowest actual costs of Maine dealers;

(3) Whether the Milk Commission Law, either on its face or as applied by the Commission, violates the Commerce Clause of the Constitution of the United States or deprives any party of equal protection of the law;

(4) Whether the minimum producer price may remain in effect if the dealer and retailer minimum prices are held invalid; and

(5) Whether the court below erred in refusing to grant an injunction.

### The Investigation

■ Was the Commission required to undertake an independent investigation of the Maine milk industry prior to the promulgation of Orders 76–1 and 76–2? If so, did its actions, including the extensive hearings, fulfil that requirement?

The controlling statute on this point, now 7 M.R.S.A. § 2954.1 (Supp.1976), has always required that minimum prices be established or changed after investigation and public hearing by the Commission. On its face, the expression "investigation and public hearing" appears to require two different sorts of activity. In the context of a minimum-price-fixing statute, a require-

ment that the responsible administrative agency investigate before acting suggests a course of systematic inquiry having as one of its purposes the gathering of information not easily or conveniently developed in a public hearing—the detailed financial condition of the businesses concerned, for example. When an agency is charged with a non-adjudicative function like the setting of minimum prices for an industry, investigation is a highly informal activity, circumscribed, to be sure, by the definition of the agency's powers, but untrammeled—except as legislation may direct otherwise—by requirements of notice, confrontation and cross-examination that normally apply to administrative hearings.

Although both investigation and hearing have as their objects the acquisition of information by the Commission, the facts developed by the two methods of inquiry may be quite different in character. No reason suggests itself for supposing that the requirements of investigation and public hearing were intended to mean that a hearing conducted by the Commission could render unnecessary a separate and independent investigation. The conflicting, highly technical, voluminous testimony in the hearings before the Milk Commission in this case suggests that independent investigation is required as a basis for correctly understanding the milk industry and its economic problems. The fact, if it be a fact, that before 1975 the Commission relied almost exclusively on data developed in its public hearings does not persuade us to the contrary in view of the plain tenor of the 1975 amendments. The long-standing availability of the subpoena power coupled with the 1975 provision of a power to inquire into the management of the businesses of producers, dealers and stores suggest strongly that the Commission is not now and never was intended to rely solely on facts and conclusions derived from its public hearings.

A suggestion to the contrary was presented to us based on the 1975 mandate to the Commission that it shall conduct independent studies of the economics and practices of the milk industry not less than once

every three years. An argument is advanced that such studies can provide sufficient background for the Commission's evaluation of testimony at its public hearings, with the result that the added requirement of an investigation before issuance of every minimum price order can no longer be regarded as mandatory. Apart from the fact that no such full-scale study had been made at the time Orders 76–1 and 76–2 were issued, it seems to us that the 1975 requirement of a triennial study supports rather than detracts from the inference that a basic aim of the 1975 revision was to compel the Commission to inform itself thoroughly about the financial condition of the Maine milk industry before setting minimum prices. That conclusion is fortified by the new power of the Commission to prescribe accounting practices of producers, dealers and stores and to establish procedures for the inspection of their records and accounts. The Commission would hardly have been given such authority if it had been intended that it might properly rely solely on facts developed in public hearings.

In further support of our conclusion that independent investigation is mandatory (a conclusion that might have been thought obvious had it not been so earnestly questioned) is the provision in the last sentence of subsection 2954.1 of the revised milk Commission Law:

"In addition to the data received through the implementation of the information gathering procedures of its rules and regulations as a basis for its determinations, the commission shall solicit and seek to receive oral and written testimony at such hearings to determine whether the minimum wholesale and retail prices then established should be changed and whether the proposed minimum wholesale and retail prices are just and reasonable."

The idea behind this language in the 1975 revision is that the Commission should establish by rules and regulations its investigative and hearing procedures, then investigate, then obtain testimony at public hearings, all for the purpose of determining whether existing minimum wholesale and retail prices should be changed and whether

proposed wholesale and retail minimums are just and reasonable. Properly employed, investigation and public hearing are interrelated in effect: through information acquired from investigation the Commission becomes better able to evaluate the testimony of witnesses at the public hearing, while the hearing itself affords the Commission an opportunity to obtain additional data and to check the accuracy of the information it has received through its own inquiries and the reliability of any tentative conclusions it may have drawn.

The legislative debate preceding enactment of the 1975 revision confirms the strong impression we derive from the language of the amendments, that the Legislature intended a commitment to effective supervision as a condition to continued protection of the milk industry. See 2 Me.Leg. Rec. (1975) B1837–39. Effective supervision must be based on a financial analysis of the Maine milk industry which can only be accomplished by independent investigation. The present lay membership of the Commission must have that information in order to be in a position to evaluate critically the technical and sometimes biased testimony and argument advanced by adversary parties at public hearings. In no other way can the Commission follow its statutory mandate to set minimum milk prices reflecting costs at the various levels of the milk production chain and assuring a just and reasonable rate of return. We conclude that an independent investigation by the Commission is required by 7 M.R.S.A. § 2954 (Supp.1976) before the Commission may issue orders that change dealer and retail margins.

■ In order to decide whether the actions of the Commission in this case constituted an "investigation" within the meaning of the revised Milk Commission Law, we first consider what the Commission did. The only witness presented by the Commission was Dr. Homer Metzger, Professor of Agricultural and Resource Economics at the University of Maine. Dr. Metzger brought up to date a study he had made for the

Commission in 1974 of the costs incurred in 1973 by Maine dealers in processing milk. On the basis of his study Dr. Metzger made certain recommendations to the Commission concerning dealer margins. His conclusions were drawn from unaudited profit-and-loss statements received from seventeen Maine dealers who voluntarily submitted them. Although the total sales of the seventeen volunteers accounted for 68 per cent of the Class I sales of all licensed distributors in Maine in 1973, it was not shown that information from those volunteers was fairly representative. The costs derived from those figures were not allocated to the various phases of the processing cycle (e. g., cost of distribution, cost of containers), nor were distinctions drawn in the analysis between costs for various sizes of containers or for different types of fluid milk products. During his testimony, Dr. Metzger several times conceded that he had little or no data on particular phases of the dealers' process. He also testified that a more thorough study could be made if data were systematically developed and that he and his staff had the expertise to evaluate such data. Dr. Metzger's study, admittedly confined by the terms on which the Commission had originally engaged it, contained little information bearing on dealers' return on investment.

The Commission did obtain through evidence received at the public hearings some information of the sort that would normally be developed as background through investigation before the hearing: For example, the commissioners looked at a map on which were indicated the locations of the various Maine milk dealers and their depots, and they examined shopping studies showing comparative milk prices in other states. But Dr. Metzger's limited study provided the only information developed by the Commission's own inquiries, as distinguished from facts and opinions obtained through testimony given at the hearings by witnesses for various parties.

In our view, such independent inquiry as the Commission purported to make as a basis for Orders 76–1 and 76–2 did not amount to an investigation in the sense in which the requirement is laid down in the statute in view of the amendments of 1975. The information developed was wholly insufficient to provide the Commission with the independent critical perspective it needed to evaluate the complex and partisan testimony offered at the hearings.

The statute itself is the best indicator of the scope of investigation required of the Commission. It seems clear from the second and fifth paragraphs of section 2953 of Title 7 that the Commission is to set up such an on-going system of accounting and reporting as will assist it at any time in making its determinations. Among other things, that system should be designed to produce information concerning the particular costs specified in subparagraphs numbered 2, 3, and 4 of the fifth paragraph of section 2953. With information continually available from such a system, the Commission will be able to address itself intelligently, after public hearings, to requests for the revision of minimum prices. Whatever system of accounting is prescribed by the Commission pursuant to the fifth paragraph of section 2953, the data acquired therefrom must assist the Commission to determine the minimum price categories referred to in subparagraphs 2, 3, and 4 of that paragraph as well as the minimum prices the Commission must establish under the guidelines of subsection 2954.2.

■ Our attention has been called to the burdensome nature of the bookkeeping and reporting that will be required of dealers if the Commission performs its duties under the revised Milk Commission Law. We understand the reluctance of dealers to undertake that burden, but the language and plan of the legislation leave no doubt that its purpose was to achieve a Commission that would inform itself fully through the exercise of its enhanced authority to acquire information on its own motion. Needless to say, in establishing its accounting and reporting system, the Commission should bear in mind the burden thereby placed on the businesses involved and should design the system carefully to avoid collection of unnecessary data.

Since 1975, the responsibility of the Commission has become more difficult to fulfil than it formerly was: it must now set minimum dealer and store prices while taking into consideration the public need for the establishment of retail milk prices at the lowest practicable levels. 7 M.R.S.A. § 2954.2. That responsibility cannot be carried out properly without a comprehensive, on-going system of acquiring information about the financial condition of the milk industry in Maine. The revised act gives the Commission full authority to establish and operate such a system.

### The Interpretation of 7 M.R.S.A. § 2954.2 and 2.B

█ The second issue in this case arises from a question about the meaning of 7 M.R.S.A. § 2954.2 and 2.B (Supp.1976). The introductory paragraph of subsection 2 of section 2954 contains a number of general factors to be taken into account by the Commission when it sets milk prices. Subparagraph B of subsection 2 is a more specific formula for the establishment of the so-called dealer margin—the amount which when added to the producer price yields the wholesale price. Our problem is to determine whether those two provisions of the statute can be harmonized in a rational construction.

The initial question is the meaning of subparagraph B of subsection 2, which provides as follows:

"The minimum wholesale prices paid to dealers shall be established to reflect the lowest prices at which milk purchased from Maine producers at Maine minimum prices can be received, processed, packaged and distributed within the State of Maine at a just and reasonable return." 7 M.R.S.A. § 2954.2.B (Supp.1976).

This formula is open to varying interpretations. Relying on the language of the subparagraph and some legislative history, Cumberland Farms argues that the provision requires the Commission to establish the dealer price on the basis of the lowest achievable costs for a dealer in Maine milk. In support of its view that its own costs are the lowest achievable in the processing of Maine milk, Cumberland introduced before the Commission evidence of the costs of its vertically integrated, limited-line operation in Portsmouth, New Hampshire, projected for the number of stores it would operate in Maine if prices were set at "true minimums." Apparently in an attempt to cover all possibilities, Cumberland also offered evidence of hypothetical costs for a Maine-based, full-line, non-integrated processing operation. Cumberland's operation is limited to the sale of milk in gallon and half-gallon containers, sold through its own dairy stores. Cumberland's decidedly lower costs are achieved through economies of scale (its Portsmouth processing plant compares in capacity with the largest in Maine), limited product line, and greater "efficiency" in delivery (no home delivery, fewer stops and larger deliveries at each store, with store personnel performing some services that are now performed by drivers for Maine dealers). Cumberland argues that the Milk Commission must employ cost figures developed from these practices in order to conform to the dictates of the statute.

The Commission rejected Cumberland's evidence as speculative and insufficiently sensitive to factors indigenous to the milk industry in Maine. It set dealer prices at a much higher level, reflecting the actual costs, adjusted for inflation, incurred by Maine's four most efficient dairies. In its brief to this Court, the Maine Milk Dealers Association defends the Commission's approach. Also relying on legislative history and the statutory language, the Dealers Association argues that the Commission properly interpreted subparagraph B as imposing an "actual cost" standard for the establishment of the dealer margins.

We conclude that subparagraph B requires the Commission to ascertain the lowest prices at which various classes and categories of milk purchased from Maine producers at Maine minimum producer prices can be received, processed, packaged and distributed in Maine at a just and reasonable return, regardless of whether any Maine dealer is in fact operating at such prices.

The words "lowest" and "can be" in subparagraph B plainly support that interpretation, and the legislative history of the statute leaves us with no serious doubt that a lowest achievable price formula was intended. The minimum wholesale prices to be established by the Commission are to reflect those prices, which may be called, for the sake of brevity, "the lowest achievable prices." It should be noticed, in particular, that the concept of "lowest achievable prices" includes an element for just and reasonable return on investment. The final minimum dealer prices established by the Commission will not necessarily coincide with the lowest achievable prices thus defined, but they must reflect them. Lowest achievable prices must form the base line from which necessary adjustments to comply with other mandates of the statute are to be made.

■ However, applying the formula in subparagraph 2.B is only the first step in arriving at dealers' minimum prices under the statute. The first paragraph of subsection 2 of § 2954 provides

"In establishing and changing minimum wholesale and retail prices, the prices so established shall be just and reasonable taking into due consideration the public health and welfare and the insuring of an adequate supply of pure and wholesome milk to the inhabitants of this State under varying conditions in various marketing areas; prevailing prices in neighboring states; seasonal production and other conditions affecting the costs of production, transportation and marketing in the milk industry, including a reasonable return to producer, dealer and store; taking into consideration the public need for the establishment of retail milk prices at the lowest practicable levels." 7 M.R.S.A. § 2954.2 (Supp. 1976).

The parties take differing positions on the effect of this group of factors in setting milk prices. Cumberland Farms argues that those factors are virtually meaningless as a group and are automatically taken into account when the dealer price is set by use of the formula of subparagraph B. The Commission argues that it must start with the criteria in subsection 2 in order to arrive at the proper dealers' prices and that the formula in subparagraph 2.B is only the end result of the use of those criteria. We reject both views.

Starting from the premise that, where possible, statutes are to be read to give effect to every part, we conclude that the guidelines listed at the beginning of subsection 2 of § 2954 must be considered by the Commission when it fixes the minimum wholesale prices of various classes and categories of milk, but that they are to be applied only after the dealers' lowest achievable prices (including a factor for just and reasonable return on investment) have been determined. In other words, the determinations made under subparagraph 2.B remain tentative until the factors set forth at the beginning of subsection 2 have been applied. A review of the history of milk regulation in Maine leads us to the conclusion we have reached. No specific formulas or guidelines were set out in the original 1935 act to govern the Commission's price-fixing power. In 1939, the Legislature added the following paragraph to the section authorizing the Commission to set milk prices:

"Prices so fixed shall be just and reasonable, taking into due consideration the insuring of an adequate supply of pure and wholesome milk and conditions affecting the milk industry, including a reasonable return to the producer, producer-dealer, and dealer." 1939 Me.P.L. ch. 138, § 2.

In 1957 that language was amended to include the factors of "public health and welfare" and "seasonal production and other conditions affecting the costs of production, transportation and marketing." Added after "the insuring of an adequate supply of pure and wholesome milk" were the words "to the inhabitants of this State under varying conditions in various marketing areas." 1957 Me.P.L. ch. 384, § 10. Finally, in 1975, the Legislature adopted the elements of "prevailing prices in neighboring

states" and "the public need for the establishment of retail milk prices at the lowest practicable levels." 1975 Me.P.L. ch. 517, § 3.

The purpose of those changes in the statute was to give increasingly specific guidance in setting prices to a Commission which had been criticized for protecting Maine dealers and producers without sufficient attention to the ultimate price to consumers. It is significant that when more specific formulas were developed to aid the new lay Commission in setting prices, the general guidelines were not stricken from the statute. Indeed, they were augmented. They must certainly be deemed to have continuing effect. It follows that the Commission is still required to consider those factors when it sets prices under the statute.

To determine how the general guidelines in subsection 2 are to be integrated with the formula of subparagraph 2.B, we must analyze their content. With one exception—the consideration of prevailing prices in other states—the elements set out in subsection 2 represent actual factors which affect the pricing of milk in Maine. The public health and welfare, adequacy of supply, seasonal production, and lowest practicable consumer price levels must all be given weight in adapting application of the theoretical formula of subparagraph 2.B to the actual conditions of milk processing in Maine. Using those guidelines, the Commission can give consideration, among other things, to the character of Maine as a rural state, to the possible need for continuing home deliveries if required by our elderly population, and to the lack, in many parts of the state, of that density of population which fosters the economies of scale and delivery that are needed to develop lower costs of milk distribution attained by firms such as Cumberland Farms.

Once the lowest achievable dealer prices are determined under subparagraph 2.B, adjustments based on the factors listed at the beginning of subsection 2 must be made to bring those theoretically lowest achievable prices into line with what is actually achievable under Maine conditions. In this way, competition is fostered while any factors special to Maine milk production and processing are still taken into account.

We also agree with the presiding justice that the Commission should make specific findings to support its adjustment of the lowest achievable prices. Such findings will be necessary for proper review of the Commission's orders and will also inform the parties of the procedures employed and the evidence considered by the Commission. This does not mean, however, that the Commission must necessarily attach to each general factor mentioned in subsection 2 a precise value in dollars and cents to be applied to the minimums tentatively established under subparagraph B.

### Constitutionality of the Statute as Applied by the Commission

Cumberland Farms argues that the Commerce Clause and the Equal Protection Clause of the Fourteenth Amendment were violated when the Commission rejected evidence of the costs of Cumberland's New Hampshire plant. In light of our holding that the Commission erred in its application of section 2954, and consistently with the principle that courts should not consider questions of constitutionality if their resolution is not critical to the disposition of the case, we need not and do not reach this issue.

### Producer Prices

The court below clearly implied, if it did not decide, that, although the dealer and retail margins set in Orders 76–1 and 76–2 were invalid, the producer prices remained valid. The independence of producer prices from retail and dealer prices is clearly contemplated by the statute. Subsection 2954.2.A requires that the producer prices "shall be based on the prevailing . . . prices in southern New England." The parties in this case agree that this means the Boston Federal Market Order price. Subsection 2954.1 provides that the requirement of public hearing may be waived "when the only changes to be made

in the minimum prices are to conform with the orders of any federal or other agency duly authorized by law to establish or negotiate producer prices." Thus, the statute authorizes the producer prices to be set on the basis of the Boston Federal Market Order and further authorizes the passing through of minimum producer prices, thus determined, into dealer and retailer minimum prices without public hearing.

We assume that after this Court affirms the lower court's invalidation of Orders 76–1 and 76–2, the Commission will continue to change minimum producer prices as the Boston prices change and that it will pass through those prices, adding the most recently valid dealer and retail margins until new margins are set. Such was the approach of the court below, and we find no error in that practical solution of the problem created by invalidity of the dealer and retailer margins established in the Commission's two orders. It must be conceded that there is a theoretical anomaly in permitting the combination of current producer minimums with dealer and retailer margins fixed by order of the Commission under the statute as it stood before the extensive revision of 1975. Yet no error has been complained of in the producer minimums set by the 1976 orders, and in such a situation to invalidate the Commission's producer minimums themselves on the ground that the 1976 orders were improperly arrived at would seem to us, as it did to the presiding justice in Superior Court, a doctrinaire ruling that could cause senseless hardship to producers. Moreover, to refuse to permit the "passing through" of changes in the Boston producer minimum prices could lead to virtual deregulation of pricing in the Maine milk industry pending issuance of new, valid orders by the Commission. That is, without any "passing through", Boston producer minimums could rise to the point where the last valid pre-1976 dealer margins would become meaningless because of the dealers' absolute need to avoid losses by raising prices. Either consequence would contravene a basic purpose of the statute.

*Remedies*

There remains the problem of the action this Court should take. The present status of the matter is as follows: The presiding justice below set aside Orders 76–1 and 76–2 to the extent they set minimum dealer and retail prices, but he refused to enjoin the Commission from implementing those orders. In the light of M.R.Civ.P. Rule 62(e), which automatically stays judgments of the Superior Court pending appeal, Order 76–2 is presumably now in effect. The Commission's brief on appeal implies as much in stating that the Commission will comply with the Superior Court's judgment should it be upheld here.

We affirm the Superior Court's reversal of Orders 76–1 and 76–2 to the extent those orders set dealer and retail margins. The retail and dealer margins established in the last valid order of the Commission should go into effect soon after the announcement of our decision. The producer prices are valid as set in Order 76–2 or in the latest of any superseding orders based on prevailing Boston Federal Market Order prices.

■ We do not remand this case for new investigation and hearing. We take judicial notice that a new round of investigation and hearings has begun. A remand would therefore be superfluous and would waste time the Commission should use for its new inquiries. The interpretation of the Milk Commission Law stated in this opinion must apply to the current activity of the Commission to determine minimum prices even though we have not remanded the present case for new hearing and investigation.

In view of the disposition we are making of these cases, it becomes unnecessary to determine whether the presiding justice was correct in refusing to enjoin the Commission from enforcing the invalid provisions of its 1976 orders.

The entry must be:

All appeals denied.

All Justices concurring.

WERNICK, J., did not sit.