CUMBERLAND FARMS NORTHERN, INC.

v.

MAINE MILK COMMISSION

and

Maine Milk Dealers Association et al.

Supreme Judicial Court of Maine.

Argued Nov. 20, 1980.
Decided April 23, 1981.

Petruccelli, Cohen, Erler & Cox, Joel C. Martin (orally), David Cohen, Portland, for plaintiff.

Jeffrey M. Frankel, Asst. Atty. Gen. (orally), Augusta, for Maine Milk Commission.

Murray, Plumb & Murray, Peter L. Murray (orally), John C. Lightbody, Portland, for Maine Milk Dealers Ass'n et al.

Before GODFREY, NICHOLS, GLASS-MAN, ROBERTS and CARTER, JJ., and DUFRESNE, A. R. J.

GODFREY, Justice.

Cumberland Farms Northern, Inc. ["Cumberland Farms"] appeals from a judgment of the Superior Court denying Cumberland Farms' application for a preliminary and a permanent injunction against enforcement of those provisions of the Maine Milk Commission's Order 80–6, dated May 15, 1980, relating to dealers and retailers. That order, which provided that it was to be effective June 1, 1980, set minimum prices to be paid to producers, dealers, and retailers for the sale of fluid milk in Maine.

Order 80–6 was based largely on a study conducted in 1979 by Dr. Homer B. Metzger, Professor of Agricultural and Resource Economics at the University of Maine at Orono. Dr. Metzger sent to Maine milk dealers a nineteen-page packet of instructions, forms, and questionnaires which sought detailed financial information concerning every phase of each dealer's processing and distribution of milk. The dealers were further required to allocate their operating expenses to eleven different "cost centers" in the production process. After checking the dealers' reports for internal consistency, Dr. Metzger used the data to determine each dealer's costs per container of standard size. Enough dealers answered the questionnaires to give Dr. Metzger a sample representing 93 percent of the milk purchased annually by dealers. Each of the responding dealers supplied the information voluntarily. Aside from his tests for internal consistency, Dr. Metzger performed no independent audit to determine whether the data were reliable.

Having calculated the dealers' unit costs, Dr. Metzger sought to establish the lowest price that would ensure the theoretically most efficient dealer a just and reasonable return of his investment. On the basis of his familiarity with the Maine milk industry, Dr. Metzger assumed that a dairy with the capacity to process 60 million pounds of milk annually would be the most efficient dealer. Next, extrapolating from the actual costs reported by Maine dealers, Dr. Metzger computed the unit processing costs

for that hypothetical most-efficient dealer. Finally he constructed a super-efficient distribution scheme for that hypothetical dealer. Relying on that construction, Dr. Metzger estimated the lowest price that that hypothetical dealer needed to charge in order to receive a reasonable return on his investment. However, Dr. Metzger conducted no independent efficiency study of any Maine dealer.

The Commission declined to set the minimum price for milk at its theoretically lowest level as thus determined. At the outset the Commission decided that the distribution scheme Dr. Metzger had hypothesized was unworkable in practice. As further justification for rejecting the theoretically lowest achievable price, the Commission cited the following factors: the need to avoid price wars that might destroy small processors; the possibility that dealers who are forced to reduce their costs might decrease the frequency of their deliveries; the desirability of creating business incentives to keep producers and dealers operating in the future; the higher costs of delivering milk during Maine winters; and the price of milk in neighboring states.

Having rejected the theoretically lowest achievable price for milk as ascertained by use of Dr. Metzger's model, the Commission established the actual minimum price by means of a "supply line" computation. In this analysis the Commission first ranked dealers in ascending order of efficiency. An imaginary line was then drawn two-thirds of the way up the ranking toward the most efficient actual dealer. The dealers above this line, who were in the top third of efficiency, also represented fifty percent of the total volume of milk processed in Maine. The Commission set the actual minimum prices so that any dealer ranked at or above the supply line would be ensured at least a 3.1 percent return on sales.

Cumberland Farms challenged Order 80–6 on the following grounds, among others: that the Commission failed to conduct an adequate investigation prior to setting minimum prices for milk; that it neglected to establish an on-going system of accounting and reporting; that it never attempted to verify the data voluntarily submitted by the dealers; that it used an erroneous method of calculating the theoretically lowest achievable price for milk in Maine that would ensure a just and reasonable return on the dealer's investment; and that it used improper criteria in setting the actual minimum prices for milk.

Employing one of the standards of review prescribed in 5 M.R.S.A. § 8058 (Supp. 1980–81)[1]—whether Order 80–6 was arbitrary, capricious, or an abuse of discretion— the Superior Court upheld the order in its entirety. The presiding justice found no error in the use of "supply line" analysis to set actual minimum prices on the ground that it was simply a means to ensure that the actual minimum prices reflect the realities of the Maine market. He found, moreover, that the Commission could use actual dealer costs in determining the theoretically lowest achievable price for milk. The justice praised Dr. Metzger's detailed question-

---

1. That section is the provision of the Maine Administrative Procedure Act governing judicial review of agency rules. Subsection 1 of section 8058, as amended by P.L.1979, ch. 669, § 1, provides as follows:

Judicial review of an agency rule, or of an agency's refusal or failure to adopt a rule where the adoption of a rule is required by law, may be had by any person who is aggrieved in an action for declaratory judgment in the Superior Court conducted pursuant to Title 14, section 5951, et seq., which provisions shall apply to such actions wherever not inconsistent with this section. Insofar as the court finds that a rule was improperly adopted or exceeds the rule-making authority

of the agency, it shall declare the rule invalid. If the court finds that the rule was properly adopted and not in excess of the agency's rule-making authority, its substantive review of that rule shall be to determine whether the rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. The phrase "otherwise not in accordance with law" shall apply only to the review authorized in the preceding sentence and shall not be construed so as to limit or replace in any way section 8003. In the event that the court finds that an agency has failed to adopt a rule as required by law, the court may issue such orders as are necessary and appropriate to remedy such failure.

naires and noted the large number of dealers who had responded to Dr. Metzger's inquiry. Although the justice saw no reason to suspect that the dealer data was unreliable, he concluded that Dr. Metzger's checks for internal consistency were a sufficient guarantee of accuracy and that an independent audit would not significantly enhance the reliability of the data. Accordingly, the justice denied Cumberland Farms' request for injunctive relief.

On this appeal, Cumberland Farms essentially repeats the arguments it made before the Superior Court and further contends that the Superior Court employed an incorrect standard of judicial review.

We recognize that the Maine Milk Commission has made substantial improvements in its investigative and deliberative procedures since our decision in *Cumberland Farms Northern, Inc. v. Maine Milk Comm'n*, Me., 377 A.2d 84 (1977), *q. v.* Nevertheless, we must conclude that Order 80–6 cannot stand.

### I.

### *The Standard of Review*

■ As a threshold matter we must determine what standard of review courts should employ in judging the validity of a Milk Commission order setting minimum prices for the sale of milk. The Commission and the Maine Milk Dealers' Association favor the standards contained in 5 M.R.S.A. § 8058 (Supp.1980–81), while Cumberland Farms advocates use of the criteria listed in 5 M.R.S.A. § 11007 (1979). Section 8058 is the provision of the Administrative Procedure Act addressing the judicial review of rules and the rulemaking process under subchapter II of the act; section 11007 provides generally for the manner and scope of judicial review of "final agency action."

The Superior Court was correct in choosing section 8058 as the applicable provision in this case. An order setting minimum prices for the sale of milk is, quite precisely, a "rule" within the meaning of 5 M.R.S.A.

§ 8002(9)(A): it is a "regulation . . . that is or is intended to be judicially enforceable and implements . . . or makes specific the law administered by the agency . . . ." Although Order 80–6 would also qualify as "final agency action" under section 11007, the general provisions of that section must yield to the more specific provisions of section 8058 by application of the normal constructional preference that gives controlling force to specific statutory provisions over general ones.

Cumberland Farms argues that Order 80–6, setting minimum milk prices, is not a "rule" but a decision rendered in an adjudicatory proceeding, and that the definition of "rule" in 5 M.R.S.A. § 8002(9) expressly excludes decisions issued in adjudicatory proceedings. Although the definition of "adjudicatory proceeding" in 5 M.R.S.A. § 8002(1) contains no reference to minimum price setting, Cumberland Farms notes that the Model State Administrative Procedure Act, which is the prototype for state legislation on the subject, expressly includes ratemaking or price fixing as a type of "contested case"—the term used in the model act instead of "adjudicatory proceeding." *See* Model State Administrative Procedure Act § 1(2) (Revised 1961 Act), 14 *Uniform Laws Annotated* 371 (Master ed. 1980).

■ The argument is not persuasive. It is at least as reasonable to infer from the Maine statute that the legislature deliberately intended to exclude price fixing from adjudicatory proceedings as it is to infer the opposite proposition from the fact that the Maine statute is ultimately derived from the model act. In fact, the Maine statute is not derived directly from the model act; it was borrowed in large measure directly from the Massachusetts administrative procedure act and, like that legislation, diverges from the model act in significant respects. Maine has followed Massachusetts in using the term "adjudicatory proceeding" instead of the term "contested case" employed in the model act.[2] The key provisions of the definition of "adjudicatory pro-

---

**2.** *See* Mass.Ann.Laws ch. 30A (Michie/Law Co-op. 1973 & Supp. 1981). *See The Partner-* *ship of Brooks Brown v. State of Maine*, Me., 426 A.2d 880 (1981).

ceeding" are nearly identical in the two statutes.[3] Like Maine, Massachusetts omits the model act's explicit inclusion of rate-making or price fixing as a type of adjudicatory proceeding. Because Maine has adopted the substance of the Massachusetts definitions of "adjudicatory proceeding" and "regulation" (or "rule")[4] considerable weight must be given to the Massachusetts cases that treat the setting of minimum prices as a form of regulation rather than as an "adjudicatory proceeding." *E. g., Kneeland Liquor, Inc. v. Alcoholic Beverages Control Comm'n*, 345 Mass. 228, 186 N.E.2d 593 (1962) (minimum prices for alcoholic beverages); *Dacey v. Milk Control Comm'n*, 340 Mass. 681, 166 N.E.2d 362 (1960) (assuming without discussion that an order setting the minimum price for milk is a "regulation").

Moreover, the administrative functions and processes involved in price fixing are more closely similar to those that are typical of rulemaking than to those that are typical of adjudication. *See generally Cambridge Elec. Light Co. v. Department of Pub. Util.*, 363 Mass. 474, 485–87, 295 N.E.2d 876, 883–85 (1973); D. Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy*, 78 Harv.L.Rev. 921 (1965). Characteristically, in comparison with most adjudicatory proceedings, price setting involves the agency in a wider range of independent investigation to determine facts and in a more complex balancing and reconciliation of interrelated interests, both public and private, to arrive at its conclusions. The Superior Court did not err in treating Order 80–6 as a "rule" subject to section 8058 of title 5.

■ Applying the standards of review provided by the second sentence of section 8058 (quoted *supra* n. 1), the presiding justice found that Order 80–6 was neither arbitrary, capricious, nor an abuse of discretion. The correctness of that particular finding need not be reviewed on this appeal, for the standard the Superior Court employed is appropriate only after an initial finding that the rule in question was "properly adopted" and "not in excess of the agency's rule-making authority." As a matter of law, Order 80–6 cannot withstand that initial inquiry.

## II.

### *The Adequacy of the Maine Milk Commission's Investigation*

■ An evaluation of the Milk Commission's procedures for instituting Order 80–6 must begin with a review of this Court's decision in *Cumberland Farms Northern, Inc. v. Maine Milk Comm'n*, Me., 377 A.2d 84 (1977) (hereinafter referred to as "*Cumberland Farms, 1977*"). In that case the Court was confronted with the question whether the Commission is required to conduct any independent investigation of the Maine milk industry before holding its public hearings on milk pricing. We stressed the necessity of a systematic unbiased inquiry enabling the Commission to evaluate the often partisan testimony presented at the public hearings. We held that the Commission must obtain information from a truly representative sample of Maine milk dealers. Though the Commission must not overburden dealers with the collection of unnecessary data, it must maintain an on-

---

**3.** 5 M.R.S.A. § 8002(1) provides as follows:
    'Adjudicatory proceeding' means any proceeding before an agency in which the legal rights, duties or privileges of specific persons are required by constitutional law or statute to be determined after an opportunity for hearing.
    The first sentence of Mass.Ann.Laws ch. 30A, § 1, provides as follows:
    'Adjudicatory proceeding' means a proceeding before an agency in which the legal rights, duties or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws

to be determined after opportunity for an agency hearing.
The Massachusetts definition then proceeds to exclude seven categories of proceeding, none of them relevant here.

**4.** In defining "rule," Maine adopts much of the substance of the Massachusetts definition of "regulation" but follows the model act in using the term "rule," rather than "regulation." *Compare* 5 M.R.S.A. § 8002(9), *with* Mass.Ann. Laws ch. 30A, § 1(5) *and* Model State Administrative Procedure Act § 1(7).

going system of accounting and reporting to assist it in making its determinations. Before setting actual minimum prices of milk, the Commission must establish baseline minimum prices that will insure the theoretically most efficient dealer in Maine a just and reasonable return on his investment. Finally, the Commission may adjust the baseline prices to account for the realities of the Maine market, keeping in mind that the actual minimum prices must reflect the theoretically lowest achievable prices.

Only if those procedures are followed does the Commission satisfy its responsibilities under its governing statute, 7 M.R.S.A. § 2954 (1979). Our conclusions in *Cumberland Farms, 1977,* were not intended as mere recommendations. They were an explication of the substantive law controlling the Commission's price setting.

In the light of the foregoing criteria, the Commission has made some improvement since 1977 in its procedures for establishing minimum milk prices. Each dealer was sent a detailed questionnaire in 1979, soliciting data about the costs associated with milk processing and distribution. In the study that formed the core of the Commission's investigation, Dr. Metzger obtained usable information from dealers who represented collectively 93 percent of the milk purchased from producers in Maine—certainly a representative sample. Furthermore, Dr. Metzger performed certain internal checks on the dealer data in an attempt to assure that each dealer's return was at least internally consistent.

■ However, the conclusion cannot be avoided that the Commission has not yet established the kind of independent ongoing investigation required by the statute, as construed in *Cumberland Farms, 1977.* It has certainly not yet "set up such an ongoing system of accounting and reporting as will assist it at any time in making its determinations." *Cumberland Farms, 1977, supra,* at 90. The heart of the problem is that the Commission's calculations could only be as accurate as the data used in them. The financial information from the

1979 survey used by the Commission in setting the minimum milk prices here in question was supplied voluntarily by the dealers and never independently audited by the Commission. Without an audit, the Commission was not in a position to know whether the information it had received from the dealers was accurate or not.

A dealer's costs of operation are critical, of course, in determining his net profit and efficiency. His basis for reporting at least some of those costs, such as depreciation of buildings, machinery and equipment, depends on the accounting procedure he uses for general business purposes. The problem of reliability of the dealer data obtained by the Commission in this case is compounded by the fact that the Commission had not prescribed standard accounting procedures, with the result that differences in dealers' methods of cost allocation could render the cost data they supplied to the Commission unreliable for purposes of comparison. That the data obtained from dealers were not wholly reliable was brought to the Commission's attention during the hearing, when Dr. Metzger testified that data from some dealers showed inexplicably low net profits in view of the reported costs and the minimum returns those dealers were necessarily assured from the sale of price-regulated milk. It is possible that those discrepancies were the result, at least in part, of lack of uniformity in accounting methods rather than the result of misstatement of costs or income. It is especially necessary, when the dealers' accounting procedures are not uniform, that some auditing of their reports going beyond a check for internal consistency be made to assure the integrity of the data base. The 1979 survey did not constitute the "independent investigation by the Commission . . . required by 7 M.R.S.A. § 2954 . . . before the Commission may issue orders that change dealer and retail margins." *Cumberland Farms, 1977, supra,* at 89.

### III.

*Calculation of the Theoretically Lowest Achievable Prices for Milk*

■ Under the controlling statute, the Milk Commission must set the minimum

wholesale prices to be paid to milk dealers so as to reflect "the lowest prices at which milk purchased from Maine producers at Maine minimum prices can be received, processed, packaged and distributed within the State of Maine at a just and reasonable return." 7 M.R.S.A. § 2954(2)(B) (1979). Before setting the minimum price, however, the Commission must take into due consideration those aspects of the Maine milk industry that tend to raise operating costs or that are important for ensuring an adequate future supply of pure and wholesome milk. 7 M.R.S.A. § 2954(2). In *Cumberland Farms, 1977*, this Court construed the provisions on minimum price setting as requiring two distinct calculations. First, the Commission must determine the theoretically lowest achievable prices for the sale of milk without regard to whether any Maine dealer is in fact selling at those prices. Having made that determination, the Commission may bring the theoretically lowest achievable prices into line with what is actually achievable under Maine conditions by considering the factors listed in section 2954(2): the need to ensure an adequate supply of milk to the various marketing areas in the state; the prevailing prices in other states; seasonal production and other conditions affecting the costs of production, transportation and marketing; the interests of producers, dealers, and retailers in obtaining a reasonable return on their investment; and, finally, "the public need for the establishment of retail milk prices at the lowest practicable levels." *See* 7 M.R.S.A. § 2954(2); *Cumberland Farms, 1977, supra*, at 91–92.

The Commission set about to determine "the lowest achievable prices" by considering Dr. Metzger's computation of the theoretically lowest achievable prices. Comparing the actual processing costs reported by Maine dealers with the volume of milk produced by those dealers, Dr. Metzger concluded that a dealer with the capacity to process 60 million pounds of milk per year would show the lowest processing costs per unit of milk sold. Then Dr. Metzger extrapolated from the actual cost data the particular unit processing costs that such a processor would be expected to experience.[5] Applying those extrapolated unit processing costs to the hypothetical 60-million-pound processor, and then hypothesizing a super-efficient scheme for distributing the milk produced by that processor, Dr. Metzger arrived at what he believed were the theoretically lowest achievable prices for milk in Maine.

■ In view of our strictures in *Cumberland Farms, 1977*, the Commission should not have adopted Dr. Metzger's model. In *Cumberland Farms, 1977*, we expressly rejected the notion that the lowest actual dealer costs could be taken as the theoretically lowest achievable costs in Maine. 377 A.2d at 91. It was not enough for the Commission to accept an assumption that a dairy of a certain size which incurs the same production costs as Maine's most efficient actual dealer represents the limit of cost-effectiveness in Maine. Rather, the governing statute contemplates an independent investigation into whether and how operating costs could be reduced if a Maine dealer were operating at the theoretical

---

5. The assumption itself is surprising. Dr. Metzger had earlier noted that there is a low or negative correlation in Maine between the quantity of milk processed per year and the costs per unit processed. A 1977 study revealed that several small-volume dealers achieved relatively low costs per unit, while some of the largest-volume dealers had comparatively high unit costs. Indeed, in that study the dealer with the lowest unit costs processed only 42 million pounds of milk per year in Maine, and none of the six next lowest-cost dealers processed more than 15 million pounds per year. H. Metzger, *Factors Affecting the Unit Costs of Milk Distribution*, 16, 18 in University of Maine at Orono, Life Sciences & Agriculture Experiment Station Bulletin No. 756 (April 1979). Furthermore, Dr. Metzger's extrapolation could not fully reveal the theoretically lowest achievable processing costs for such a processor. The extrapolation could only show the extent to which economies of scale might increase the efficiency of a Maine dealer. Economies of scale are only one variable that may affect efficiency levels. The extrapolation had no tendency to show the extent to which efficiency could be increased by improvement in processing methods, independent of the sheer size of the operation.

peak of efficiency. The legislature wanted the Commission to be unrestrained by the efficiency standards and cost levels of existing Maine dealers. Although the Commission was aware of firms that specialize in conducting efficiency studies of milk processors in other states, it declined to order any independent efficiency study.[6] The Commission's failure to investigate what cost levels are *achievable* in Maine, rather than what expenses are presently being incurred, caused it to fall short of meeting the requirements of 7 M.R.S.A. § 2954(2), as construed by *Cumberland Farms, 1977.*

## IV.

### The Commission's Use of "Supply Line" Analysis to Set Actual Minimum Prices for Milk

After the Commission settled on its theoretically lowest achievable prices, it purported to "adjust" those prices upward to bring them in line with what the Commission believed were the realities of the Maine market. The Commission made general findings concerning the factors it had to consider under 7 M.R.S.A. § 2954(2) and concluded that even on its own computation of the theoretically lowest achievable prices, those prices could not reasonably be made the actual minimum prices.

In setting what it believed were the appropriate actual minimum prices for milk, the Commission endorsed a "supply line" analysis, in which the dealers were ranked in inverse order of the amount of their unit costs for milk sold in the various sizes and types of containers. A line was drawn just below the putatively most efficient top third, who also represented about 50 percent of the milk processed in Maine; then the actual minimum prices were computed so as to ensure a dealer on that supply line a 3.1 percent return on his sales.[7]

■ "Supply line" analysis, properly used, may be unobjectionable as one method among many for coming to an ultimate decision fixing the actual minimum prices for milk. However, it may not be used purely as a substitute for the analysis plainly required by the statute as construed in *Cumberland Farms, 1977.*

In that case we interpreted 7 M.R.S.A. § 2954(2) as requiring the Commission to set actual minimum prices which "reflect" the theoretically lowest achievable prices for milk. Although we excused the Commission from attempting to assign to each factor in 7 M.R.S.A. § 2954(2) a precise value in dollars and cents, we made clear that the theoretically lowest achievable prices "must form the baseline from which necessary adjustments to comply with other mandates of the statute are to be made." 377 A.2d at 92. In Order 80–6, after stating that it was proceeding "to consider the adjustment to the theoretically lowest achievable prices necessary to meet the other statutory criteria," the Commission essentially ignored the theoretically lowest achievable prices as it pursued its supply line analysis. The Commission did not assess the varying impacts of the factors listed in the statute, but instead cited the existence of cost-elevating factors as a rationale for, in effect, disregarding the baseline prices completely. Although the supply line may be a legitimate means of ensuring a fair return for dealers operating at existing levels of efficiency, it does not "reflect," as the statutes requires, the theoretically lowest achievable prices.

■ We should not be understood as implying that the actual minimum prices may not reflect supply-line prices as well as the baseline prices; the Commission must be sensitive to the costs presently being incurred by actual Maine dealers. However, in order to serve the public need to obtain

---

**6.** It appeared from the hearings that the Commission lacks personnel of its own to make the necessary efficiency studies.

**7.** The theory which apparently underlies "supply line" analysis is that the public need for milk can best be served by preserving a number of dealers sufficient to supply a reasonable

amount of milk. As drawn by the Commission in this case, the supply line is intended to ensure that those most efficient dealers who collectively produce 50 percent of the milk sold in Maine will obtain a reasonable return on investment and thus will remain in business.

milk at the lowest practicable prices, the Commission must not be inhibited by the dealers' current standards of efficiency. Under the governing statute the Commission may not assume, in complete disregard of the theoretically lowest achievable prices, that the actual lowest-cost dealers in Maine are operating at the limits of possible efficiency, or even that the actual dealer on the supply line represents a model of reasonable cost effectiveness. Rather, the Commission must begin with the theoretically lowest achievable prices and adjust them upward only if, and to the extent that, each of the considerations listed in 7 M.R.S.A. § 2954(2) individually compels such an adjustment.

## V.

### *The Remedy*

Because of the deficiencies noted above, Order 80–6 must be set aside to the extent that it sets minimum prices to be paid to dealers and retailers for the sale of fluid milk. Minimum dealer and retailer margins shall be governed by the last order of the Commission which is valid as to those margins. Producer prices are valid as set in Order 80–6 or in the latest of superseding orders based on prevailing Boston Federal Market Order prices.

As in *Cumberland Farms, 1977*, we do not remand this case for a new investigation and hearing. We recognize that the Commission is continually gathering data in preparation for future milk-pricing orders, and we do not wish to interrupt that process through a superfluous remand. However, we stress that the Commission's current activity must be governed by the interpretation of the milk commission law contained in *Cumberland Farms Northern, Inc. v. Maine Milk Comm'n*, Me., 377 A.2d 84 (1977), and this opinion. The procedures the Commission adopts in setting minimum prices must be in accord with the statutory requirements.

The entry is:

Judgment vacated with respect to minimum prices for dealers and retailers; judgment affirmed in other respects.

Remanded to Superior Court to enter judgment modifying Commission Order 80–6 in accordance with Part V of the opinion herein.

All concurring.