H.P. HOOD, INC., Plaintiff,

v.

COMMISSIONER OF AGRICULTURE, FOOD AND RURAL RESOURCES, et al., Defendants.

Civ. No. 90–0193–B.

United States District Court, D. Maine.

May 6, 1991.

Carl E. Kandutsch, Michael T. Healy, Verrill & Dana, Portland, Me., John Vetne, Blodgett, Makechnie & Vetner, Peterborough, N.H., for plaintiff.

Eric Bryant, Asst. Atty. Gen., Augusta, Me., for defendants.

### ORDER AFFIRMING THE RECOMMENDED DISPOSITION OF THE MAGISTRATE JUDGE

HORNBY, District Judge.

The United States Magistrate Judge filed with the Court on March 21, 1991, with copies to counsel, his Recommended Disposition of Defendants' Motion for Judgment on the Pleadings, attached hereto and made part hereof as Exhibit A. Plaintiff filed Objections to the Magistrate Judge's Recommended Disposition on April 5, 1991 and defendants responded to Plaintiff's Objections on the Magistrate Judge's Recommended Decision on April 24, 1991. I have reviewed and considered the Magistrate Judge's Recommended Disposition, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Disposition; and I concur with the recommendations of the United States Magistrate Judge for the reasons set forth in his Recommended Disposition, and determine that no further proceeding is necessary.

It is therefore ORDERED as follows:

1. The Recommended Disposition of the Magistrate Judge is hereby *ADOPTED;*

2. The Defendants' Motion for Judgment on the Pleadings is *GRANTED* and the Complaint is *DISMISSED,* without prejudice.

### EXHIBIT A

### RECOMMENDED DISPOSITION OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

EDWARD H. KEITH, United States Magistrate Judge.

This case involves the application, interpretation, and interaction of state and fed-

eral statutes and regulations affecting the regulation of prices in the milk industry. Milk prices are regulated at both the state and federal levels. The governing state statutes are the Maine Milk Commission law [7 M.R.S.A. §§ 2951–2963 (1964 & Supp.1990)] and the Maine Milk Pool law [7 M.R.S.A. §§ 3151–3156 (1964 & Supp. 1990)] (collectively, the Maine milk laws, or state regulation). At the federal level prices are regulated under the New England Milk Marketing Order (7 C.F.R. Part 1001, promulgated pursuant to the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. § 601 et seq.) (federal milk laws, or federal regulation).

The function of the Maine Milk Commission is "to establish and change the minimum wholesale and retail prices for the sale of milk within the State...." 7 M.R.S.A. § 2953. *See also, Maine Milk Commission v. Cumberland Farms Northern, Inc.,* 160 Me. 366, 368–70, 379–84, 205 A.2d 146, 147–48, 152–53 (1964) [court discusses purposes of what is now 7 M.R.S.A. §§ 2951–2963 (1964 & Supp.1990)]; *Cumberland Farms Northern, Inc. v. Maine Milk Commission,* 377 A.2d 84, 86–87, 92–93 (Me.1977) (same).

Under the state and federal price regulations, milk is categorized into two classifications. Class I milk, which is fluid milk for bottling; and Class II milk, which is milk not used for bottling, but rather is used in such products as butter and cheese. Class I milk is higher priced than Class II milk. There are two categories of Maine dairy farmers, depending upon the market to which they sell their milk: those that sell to the so called Boston market, and those that sell to the Maine market. The Boston market is federally regulated under the Federal Milk Order No. 1, 7 C.F.R. Part 1001, promulgated under the Agricultural Adjustment Act, 7 U.S.C.A. § 601 et seq. (1980 & Supp.1990). Because of the price differences between the two types of milk, and because of the historically greater demand, or utilization rate, for Class I milk in the Maine market, Maine dairy farmers who sold to the Maine market received a higher price for their milk than those Maine dairy farmers who sold to the federally controlled Boston market.

Maine adopted the Maine Milk Pool law (7 M.R.S.A. § 3151 *et seq.*) to eliminate the disparity in returns that existed between the two markets, thereby equalizing the milk prices received by all Maine dairy farmers. The Maine Milk Pool is a common fund administered by the State. When milk is sold to a Maine market dealer, the dealer deducts a computed sum from the producer and pays it into the pool. The funds in the pool are periodically allocated among all Maine dairy farmers, including those selling to the federally controlled Boston market. This is designed to effect an equalization of the prices received for their milk by the Maine market producers and the Boston market producers. A more detailed explanation of the function and purpose of the Maine Milk Pool law is found in *Maine Milk Producers, Inc. v. Commissioner of Agriculture, Food and Rural Resources,* 483 A.2d 1213, 1215–19 (Me.1984) (court discusses purposes of 7 M.R.S.A. § 3151 et seq.); *See also* 7 M.R.S.A. § 3151 (purposes).

In addition to the Maine Milk Pool, there is a federal milk pool, which serves a similar purpose. The federal milk pool is called the "producer settlement fund," the operation and function of which is discussed in 7 C.F.R. § 1001.70. Basically, as for the Maine Milk Pool, the purpose of the federal milk pool is to eliminate the disparity in income returns to milk producers caused by differences in utilization rates, between the two classes of milk, among the milk dealers. *See* 7 C.F.R. § 1001.70 and 7 C.F.R. Part 1000 generally (federal regulations involving the producer settlement fund). *See also Maine Milk Producers,* 483 A.2d at 1216 (discussing purpose of the federal producer settlement fund); *United States v. Rock Royal Co-operative, Inc.,* 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939) (purposes and constitutionality of the Agricultural Marketing Agreement Act of 1937).

This dispute arose when H.P. Hood, Inc. (Hood) paid $103,793.85 into the Maine Milk

Pool for the months of November, 1989 through January, 1990 (the "disputed period"). Hood made those payments under the mistaken belief that it was under state regulation for the disputed period. The Federal Market Administrator, however, later determined that Hood was subject to the federal regulations for the disputed period, requiring Hood to pay $215,913.16 to the federal milk pool. Hood paid that amount to the federal milk pool, and then set off the amount it had paid to the Maine Milk Pool for the disputed period against future amounts owed to the Maine Milk Pool. The Commissioner of Agriculture, Food & Rural Resources, for the State of Maine, and the Maine Milk Commission (collectively, "Maine") objected to the offset, and consequently initiated a state enforcement action in Maine Superior Court, Kennebec County (*Commissioner of Agriculture v. H.P. Hood, Inc.*, No. CV–90–308) ("state action") on June 14, 1990 seeking $80,035.04 that Hood allegedly owed the Maine Milk Pool for the months of March and April, 1990.

Hood filed the instant action ("federal action") on July 10, 1990 naming as defendants the plaintiffs in the state action. Hood asserts that Maine failed to consider the interaction of its milk pooling and pricing laws with those of the federal government. In this action, Hood seeks a declaration that Maine misinterpreted the Maine Milk Pool law [7 M.R.S.A. §§ 3151–3156 (1964 & Supp.1990)] and the Maine Milk Commission law [7 M.R.S.A. §§ 2951–2963 (1964 & Supp.1990)]; or that these laws as applied to Hood violate the Supremacy Clause, the Commerce Clause, and the Equal Protection Clause of the United States Constitution; and violate the equal protection requirements of the Maine Constitution. Hood seeks also to enjoin Maine from making any demand or assessment, or from bringing an enforcement action for payment into the Maine Milk Pool for any period that Hood is subject to regulation under the New England Milk Marketing order. Hood also seeks to enjoin Maine from otherwise administering the Maine Milk Pool Act or the Maine Milk Commission Act in any manner in conflict with the Agricultural Marketing Agreement Act and the New England Marketing Order. Hood bases jurisdiction on 28 U.S.C. §§ 1331, 1337, and 2201. The issue is whether Hood can be subject to state regulation at the same time it is subject to federal regulation.[1]

Maine responded to Hood's initiation of the instant federal action with a motion for judgment on the pleadings, with arguments based on the abstention doctrine. Hood filed a timely objection to the motion.

In a line of cases commencing with *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court counsels that a federal court should abstain from hearing certain types of cases under certain circumstances when there is a pending state proceeding. *Younger* held that a federal court should abstain from enjoining a state court criminal proceeding that was pending at the time the federal suit was begun. *Younger*, 401 U.S. at 43–54, 91 S.Ct. at 750–755. The *Younger* court premised the holding on the well established notions of equity and federalism. *See Younger*, 401 U.S. at 43–44, 91 S.Ct. at 750–51. *See also Bettencourt v. Board of Registration In Medicine of the Commonwealth of Massachusetts*, 904 F.2d 772, 776 (1st Cir.1990) (same).

The Supreme Court, however, admonishes that "[a]bstention from the exercise

---

1. Maine, clarifying the issue in a reply memorandum, states: "Maine, however, is not contesting the federal administrator's authority but rather Hood's assertion that Hood was therefore exempt under concurrent State regulation. Defendant's [Maine's] Reply to Plaintiff's Memorandum in Support of Opposition to Defendant's Motion for Judgment on the Pleadings, p. 3.
 Hood similarly phrases the issue: "The primary issue before this court remains …:

Whether federal law allows the State to require Hood to contribute to the Maine Milk Pool for transactions with respect to which Hood must also pay into the federal producers settlement fund under the Federal Milk Order." Plaintiff's [Hood's] Memorandum in Support of Opposition to Defendant's Motion for Judgment on the Pleadings, p. 9.

of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). *Colorado* went on to explain that the abstention doctrine " 'is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. . . .' " *Colorado,* 424 U.S. at 813, 96 S.Ct. at 1244 quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1062–63, 3 L.Ed.2d 1163 (1959). The Supreme Court, with the First Circuit following suit, has consistently maintained that position. *See, e.g. Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 14, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983) (same); *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2326, 81 L.Ed.2d 186 (1984) (same); *City of Houston v. Hill,* 482 U.S. 451, 467, 107 S.Ct. 2502, 2512, 96 L.Ed.2d 398 (1987) (same); *New Orleans Public Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 359, 109 S.Ct. 2506, 2513, 105 L.Ed.2d 298 (1989) (same); *Planned Parenthood League of Massachusetts v. Bellotti,* 868 F.2d 459, 464 (1st Cir.1989) (same).

■ *Younger* involved an attempt to have a federal court enjoin a state criminal proceeding that was pending at the time the federal suit was initiated (*Younger supra*). In a companion case, the Supreme Court applied the same principles to the issuance of federal declaratory relief. *Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688 (1971). Hence, whether injunctive or declaratory relief is sought does not affect the applicability of *Younger.* In this case, Hood seeks both injunctive and declaratory relief with respect to the pending state court action.

■ The *Younger* doctrine originated in the context of pending state criminal proceedings. Hood argues that *Younger* is limited only to criminal or quasi-criminal proceedings, and concludes that this court should not abstain, since the pending state

court proceeding is neither criminal nor quasi-criminal in character.

The *Younger* abstention doctrine has been extended to pending state civil, as opposed to criminal, proceedings. *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) was the first such case. *Huffman* applied the *Younger* principles to a pending state court civil proceeding involving a public nuisance statute. *Huffman,* however, carefully delimited its extension of *Younger* to civil cases that were quasi-criminal in character. *See Huffman,* 420 U.S. at 604–605, 95 S.Ct. at 1208–1209.

*Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) followed *Huffman,* and expressly extended the applicability of *Younger* in holding that "the principles of *Younger* and *Huffman* are not confined solely to the types of state actions which were sought to be enjoined in those cases." *Juidice,* 430 U.S. at 334, 97 S.Ct. at 1216. *Juidice* applied the doctrine to the "State's interest in the contempt process." *Juidice,* 430 U.S. at 335, 97 S.Ct. at 1217. In so doing, the court commented that the state's interest was "of sufficiently great import to require application of the principles of [the *Younger* and *Huffman*] cases." *Juidice,* 430 U.S. at 335, 97 S.Ct. at 1217. While *Juidice* did not affirmatively pronounce a general rule applying *Younger* to all civil proceedings that implicate an important state interest, it did leave that possibility open for a future time. *See Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) *infra.*

*Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) applied the abstention doctrine to a pending attachment procedure in a civil suit instituted by the Illinois Department of Public Aid against the appellees. In that suit, the state claimed that the appellees "had fraudulently concealed assets while applying for and receiving public assistance." *Trainor,* 431 U.S. at 435, 97 S.Ct. at 1913. In holding that *Younger* applies to the civil attachment proceeding, *Trainor,* unfortunately,

gave ambiguous reasoning. On the one hand, *Trainor* recognized the "important state policies" of "safeguarding the fiscal integrity of [the public assistance] programs." *Trainor*, 431 U.S. at 444, 97 S.Ct. at 1918. On the other hand, apparently relying on *Huffman* (extending *Younger* to civil proceedings that were quasi-criminal in nature, *supra*), *Trainor* stated a second reason: "The state authorities also had the option of vindicating these policies through criminal prosecutions," since the alleged conduct of the appellees was a crime under the state law. *Trainor*, 431 U.S. at 444, 435, 97 S.Ct. at 1918, 1913. *Trainor* thus identified two competing reasons for the application of *Younger* to the pending civil attachment proceeding: the important state interests which the civil proceeding sought to protect; and the criminal nature of the alleged misconduct of the appellees. The reasons are described as competing because the first attempts to go beyond the *Huffman* requirement that the civil proceeding be quasi-criminal in nature, while the second reason reverts to that *Huffman* requirement. Those competing reasons are called ambiguous because *Trainor* failed to explain whether either of those two considerations carried greater weight than the other.

The Supreme Court again sent mixed signals in the subsequent case of *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). *Moore* applied the *Younger* abstention doctrine to a pending state civil custody hearing involving children allegedly abused. Like *Trainor*, *Moore* suggested the same two competing rationales, without discussing their respective importance. In particular, in one instance, *Moore* premised its holding on the *Huffman* limitation to quasi-criminal proceedings. *See Moore*, 442 U.S. at 423, 99 S.Ct. at 2377. But *Moore* also suggested the "important state interests" in family relations and the prevention of child abuse as reasons for abstaining under *Younger*. *See Moore*, 442 U.S. at 423, 435, 99 S.Ct. at 2377, 2383. Nevertheless, while *Moore*, like *Trainor*, enunciated no clear rule or guidelines for the application of the *Young-er* abstention doctrine to pending civil proceedings in state court, those decisions clearly showed that the Court was willing to extend *Younger* at least to certain types of noncriminal proceedings, but leaving vague the breadth of that extension.

*Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) is next in this line of Supreme Court cases. The *Middlesex* case is important because for the first time, the Supreme Court provided a clear statement on the applicability of *Younger* to civil proceedings, along with a convenient three part test as guidelines (*Middlesex* guidelines, *infra*): "The policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved." *Middlesex*, 457 U.S. at 432, 102 S.Ct. at 2521 (citing *Moore*, 442 U.S. at 423, 99 S.Ct. at 2377; *Huffman*, 420 U.S. 592, 594, 95 S.Ct. 1200, 1201; *Trainor*, 431 U.S. 434, 97 S.Ct. 1911; *Juidice*, 430 U.S. 327, 97 S.Ct. 1211).

*Middlesex* is important also because it cleared the ambiguity of the earlier *Juidice, Trainor,* and *Moore* (discussion *supra*) cases by offering its interpretation of those cases. In particular, prior to *Middlesex*, the ambiguity that existed in those cases was for their possible interpretation that *Younger* abstention may apply to a civil proceeding that involves an important state interest, but only if that civil proceeding also in some way involved a criminal law interest of the state. (*Juidice, Trainor,* and *Moore* discussion *supra*). The *Middlesex* interpretation of those cases is significant because it shows that they are now to be viewed as varying applications of the general principle that *Younger* should apply to civil proceedings "when important state interests are involved," (*Middlesex supra*) without having to also show that the civil proceeding in some way involved a criminal law interest of the state. In that regard, the court explained:

The importance of that state interest may be demonstrated by the fact that the noncriminal proceedings bear a close relationship to proceedings criminal in nature, as in *Huffman, supra.* Proceedings necessary for the vindication of im-

portant state policies or for the functioning of the state judicial system also evidence the state's substantial interest in the litigation. *Trainor v. Hernandez,* 431 U.S. 434 [97 S.Ct. 1911, 52 L.Ed.2d 486] (1977); *Juidice v. Vail,* 430 U.S. 327 [97 S.Ct. 1211, 51 L.Ed.2d 376] (1977). Where vital state interests are involved, a federal court should abstain "unless...." *Moore,* 442 U.S. at 426 [99 S.Ct. at 2378].

*Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521.

Hood's desired restriction of *Younger* to only criminal and quasi-criminal proceedings thus has been firmly foreclosed by the Supreme Court. The discussion above shows that the Supreme Court has abandoned the limitation of *Huffman* to quasi-criminal proceedings on which Hood apparently relies. This court does recognize, however, that the Supreme Court has repeatedly disclaimed any intention of announcing a rule making *Younger* applicable to all state civil proceedings. *See Huffman,* 420 U.S. at 607, 95 S.Ct. at 1209 (refusing to comment on the "applicability of *Younger* to all civil litigation"); *Juidice,* 430 U.S. at 336 n. 13, 97 S.Ct. at 1218 n. 13 (same); *Trainor,* 431 U.S. at 444–45 n. 8, 97 S.Ct. at 1918 n. 8 (same); *Moore,* 442 U.S. at 423, 99 S.Ct. at 2377 (same); *Pennzoil Co. v. Texaco Inc.,* 481 U.S. 1, 14 n. 12, 107 S.Ct. 1519, 1527 n. 12, 95 L.Ed.2d 1 (1987) (same); *New Orleans,* 491 U.S. at 367–68, 109 S.Ct. at 2517–18 (same).

In considering the applicability of the *Younger* doctrine to pending state bar disciplinary hearings, *Middlesex* analyzed the issue by posing three questions. *Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521. Those questions suggest guidelines useful in determining the general applicability of the *Younger* abstention doctrine to a pending noncriminal proceeding:

> [F]irst, do [the pending proceedings] ... constitute an ongoing state judicial proceeding; second, do the proceedings implicate important state interest; and third, is there an adequate opportunity in the state proceedings to raise constitutional challenges.

*Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521. Those requirements will be applied here in determining the applicability of *Younger.*

■ The first *Middlesex* question is whether the pending proceeding is a judicial process. In contending that it is not, Hood seems to refer to the decision making process of the Maine Milk Commission when it determined that Hood owed the disputed sum. Hood, however, is focusing on the wrong entity. This court is asked to abstain to a pending proceeding in state court, not to an administrative body. Therefore, without looking to the decision making process of the Maine Milk Commission that led to its initiating the suit in state court, this court will now examine only whether the pending proceeding in the state court is judicial in nature.

*New Orleans Public Service, Inc. v. Counsel of City of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) emphasized that the Supreme Court has never extended the *Younger* abstention doctrine "to proceedings that are not 'judicial in nature.'" *New Orleans,* 491 U.S. at 370, 109 S.Ct. at 2519 quoting *Middlesex,* 457 U.S. at 433–34, 102 S.Ct. at 2522. *New Orleans* suggested a test to differentiate a judicial from a legislative proceeding:

> "A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power."

*New Orleans,* 491 U.S. at 370–71, 109 S.Ct. at 2519, quoting *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226–27, 29 S.Ct. 67, 69–70, 53 L.Ed. 150 (1908). *New Orleans* also explained that the nature of the pending proceeding to which the abstention question is addressed is determined by the effect of that proceeding: The proper characterization, *New Orleans* states,

"depends not upon the character of the body but upon the character of the proceedings.... [T]he effect of the inquiry [that is, the pending proceeding under consideration in the abstention analysis], and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up.... The nature of the final act determines the nature of the previous inquiry.... So when the final act is legislative[, for example,] the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case."

*New Orleans,* 491 U.S. at 371, 109 S.Ct. at 2519 quoting *Prentis,* 211 U.S. at 226–27, 29 S.Ct. at 69–70.

This court must look to the nature, and not the form, of the pending proceeding in resolving the first *Middlesex* question. Under the *New Orleans* analysis, the mere fact that the pending proceeding is in a state court is not determinative. (*New Orleans supra*). Basically, Hood is challenging the right of Maine to subject Hood to state regulation while Hood is also subject to federal regulation. In the state court action, Maine is seeking an amount allegedly owed by Hood in a claim based on state law. To resolve the dispute, the state court is called upon to interpret state law and its interaction with federal law. These functions are classically judicial in nature. It is true that the decision of the state court could affect future liability of Hood and parties other than Hood. But that is true of most court decisions because they serve the purpose of precedent. In particular, because any future impact of the pending state court proceeding can extend beyond no more than the purpose of precedent generally accorded judicial decisions, the pending proceeding is judicial, and not legislative, in nature. *Cf. Supreme Court of Virginia v. Consumers Union of the United States, Inc.,* 446 U.S. 719, 721–24, 731–37, 100 S.Ct. 1967, 1969–70, 1974–77, 64 L.Ed.2d 641 (1980) [in promulgating the Virginia Code of Professional Responsibili-

ty (Code), under its authority to regulate and discipline attorneys, the appellant Virginia Supreme Court acts in a rulemaking, or legislative capacity; but when the court, under authority of the state statute, initiates proceedings against attorneys, then the court acts in an enforcement capacity; finally, the courts also play an adjudicative role in enforcing the Code similar to their function in enforcing other statutes]. Based on the criteria set forth in *New Orleans,* the proceeding now pending before the state court is judicial in nature, thus meeting the first *Middlesex* requirement.

■ The second *Middlesex* factor for the court to examine in determining whether the pending proceeding is one to which the federal court must abstain is whether the pending proceeding implicates an important state interest. (*Middlesex supra*). Hood says that the pending proceeding is not of the type to which the court should abstain for two reasons. One reason, Hood claims, is that the pending proceeding is not criminal or quasi-criminal in nature, apparently relying on the *Younger* and *Huffman* decisions. This first objection is without merit, as the court has addressed above. Hood alternatively claims that the court should not abstain since the pending proceeding does not implicate an important state interest, calling the state proceeding a mere collection action. That objection, too, is without merit.

The interests of the State of Maine in its dairy industry is well explained within the statutes. The Maine Milk Pool law expresses Maine's interest in fostering a healthy dairy industry. *See* 7 M.R.S.A. § 3151 (state interests in system of redistribution of milk profits among milk producers). *See also Maine Milk Producers, Inc. v. Commissioner of Agriculture, Food and Rural Resources,* 483 A.2d 1213, 1215–19 (Me.1984) (court discusses purposes of and state interests protected by 7 M.R.S.A. § 3151 et seq.); *Crane v. Commissioner of Department of Agriculture, Food and Rural Resources,* 602 F.Supp. 280, 283–84 (D.C.Me.1985) (same). The Maine Milk Commission law, in complemen-

tary fashion, expresses Maine's interests in "regulating and insuring an adequate supply of pure and wholesome milk to inhabitants of this State...." 7 M.R.S.A. § 2953–A. *See also* 7 M.R.S.A. § 2954 paragraph 2 (considerations in establishing prices). *See also Maine Milk Commission v. Cumberland Farms Northern, Inc.*, 160 Me. 366, 368–70, 379–84, 205 A.2d 146, 147–48, 152–53 (1964) [court discusses purposes of and state interests protected by what is now 7 M.R.S.A. §§ 2951–2963 (1964 & Supp.1990)]; *Cumberland Farms Northern, Inc. v. Maine Milk Commission*, 377 A.2d 84, 86–87, 92–93 (Me.1977) (same).

The pending state court proceeding implicates important state interests dealing with the regulation by the State of Maine of its milk industry. Those important interests are expressly articulated within the Maine statutes, and those statutes are the basis of Maine's claim. Hood attempts to diminish the interests of the state by referring to the pending state court proceeding as a mere collection action. Indeed, *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) and *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) could, by Hood's diminutive characterization, be reduced to mere collection actions. To the contrary, however, both involved important state interests.

■ In determining whether the State's interest is important enough to warrant abstention, therefore, the focus is not on the State's immediate interest in the outcome of the specific suit in question, but on a State's overall interest in enforcing or reviewing actions affecting the interests governed by the applicable state statute or regulation:

> [W]hen we inquire into the substantiality of the State's interest in its proceedings we do not look narrowly to its interest in the *outcome* of the particular case—which could arguably be offset by a substantial federal interest in the opposite outcome. Rather, what we look to is the importance of the generic proceedings to the state. In *Younger*, for example, we did not consult California's interest in

prohibiting John Harris from distributing handbills, but rather its interest in "carrying out the important and necessary task" of enforcing its criminal laws. [*Younger*, 401 U.S.] at 51–52 [91 S.Ct. at 754].

*New Orleans*, 491 U.S. at 365, 109 S.Ct. at 2516 (emphasis in original).

The appropriate question in the *Younger* analysis is thus not narrowly confined to whether Maine has a right to collect the sum of money that Hood allegedly owes. That is, the importance of Maine's interests is not analyzed in terms of the immediate outcome of the pending state proceeding. Rather, the question is, more broadly, whether Maine has a right to enforce and collect payments from parties under the Maine milk laws in order to protect the important interests of the state for which those laws were designed. The maintenance of a healthy dairy industry clearly implicates an important state interest. The interplay between state and federal regulation of the milk industry and its impact on milk production and milk supply in Maine is obviously of substantial interest to Maine.

■ The third *Middlesex* factor for the court to examine in determining whether the pending proceeding is one to which the federal court must abstain is whether there is an adequate opportunity in the state proceeding to raise constitutional challenges. Hood argues that Maine did not, in its pleadings and memoranda, clearly articulate its legal position. Apparently, Hood is claiming that it is barred, or hampered, from making its constitutional challenges in the pending state court action by those alleged insufficiencies of Maine's state court complaint. Without deciding that question, this court notes both parties understand, as expressed throughout the record, the basic nature of the dispute and the underlying issue: that Maine is suing Hood in state court claiming that Hood can be subject to state regulation at the same time that Hood is subject to federal regulation; that Maine is seeking enforcement under the pertinent state statutes and regulations for payments Hood allegedly did not make; and that the state court may be

called upon to interpret the pertinent state and federal statutes and regulations. That is enough. Hood understands the basic nature of the dispute and the underlying issues. Hood is in no way barred or disadvantaged, procedurally, statutorily, or by alleged insufficiencies of Maine's pleadings, from making its constitutional challenges in the pending state court action. *Middlesex* explains:

> Where vital state interests are involved, a federal court should abstain "unless state law clearly bars the interposition of the constitutional claims." *Moore*, 442 U.S. at 426 [99 S.Ct. at 2379]. "[T]he … pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims…." *Id.*, at 430 [99 S.Ct. at 2380]. See also *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

*Middlesex*, 457 U.S. at 432, 102 S.Ct. at 2521. Hood has an opportunity to raise its constitutional questions in the pending state court proceeding.[2]

Hood argues that the resolution of federal questions is the primary responsibility of federal courts. But, the *Younger* abstention doctrine is based on the recognized competence and duty of state courts to determine such matters:

> [T]o restrain a state proceeding that afforded an adequate vehicle for vindicating the federal plaintiff's constitutional rights "would entail an unseemly failure to give effect to the principle that state courts have the solemn responsibility equally with the federal courts" to safeguard constitutional rights and would "reflec[t] negatively upon the state court's ability" to do so.

*Trainor*, 431 U.S. at 443, 97 S.Ct. at 1917 quoting *Steffel v. Thompson*, 415 U.S. 452, 460–61, 462, 94 S.Ct. 1209, 1216–17, 1217, 39 L.Ed.2d 505 (1974). *See, Bettencourt*, 904 F.2d at 776 ("Underlying our federal system is a presumption that the state courts are as capable as their federal counterparts of guaranteeing federal rights.")

However, the *Younger* abstention doctrine does come with well recognized exceptions. *Younger* does not apply

> in those cases where the District Court properly finds that the state proceeding is motivated by a desire to harass or is conducted in bad faith, or where the challenged statute is " 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' "

*Huffman*, 420 U.S. at 611, 95 S.Ct. at 1211 quoting *Younger* 401 U.S. at 53–54, 91 S.Ct. at 754–55, in turn quoting *Watson v. Buck*, 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941); quoted with approval in *Juidice*, 430 U.S. at 338, 97 S.Ct. at 1218, and in *Moore*, 442 U.S. at 424, 99 S.Ct. at 2378. *See also Trainor*, 431 U.S. at 442 n. 7, 446–47, 97 S.Ct. at 1917 n. 7, 1919–20, 52 L.Ed.2d 486 (same); *Middlesex*, 457 U.S. at 437, 102 S.Ct. at 2524 (same); *New Orleans* 491 U.S. at 366–67, 109 S.Ct. at 2516–17 (same).

The *Younger* exceptions can be divided into two categories. The first category focuses on the pending proceeding to which the federal court is being asked to abstain: "… where … the state proceeding is motivated by a desire to harass or is conducted in bad faith…." (*Huffman supra*). The second category focuses on the challenged statute: "… or where the challenged statute is " 'flagrantly and patently violative….' " (*Huffman supra*). Invoking the *Younger* exceptions, Hood says

---

**2.** In commenting on the distribution of the functions of the Federal and State governments, the Maine court has observed:

> Given a field of activity in which the Federal government may exercise power, it may remain proper for the State to occupy the field until the Federal government exercises the power. At that point, the State must retire. No action by the State produces the result. No amendment of its law is necessary. A

superior power has undertaken to act, and the lesser power must give way.

*LaFleur, Atty. Gen. v. Frost*, 146 Me. 270, 282, 80 A.2d 407 (1951).

Likewise, the court has noted that:

> The Constitution of the United States is the supreme organic law. A State statute repugnant to the Federal Constitution is void.

*State v. Cohen*, 133 Me. 293, 299, 177 A. 403 (1935).

that the court should not abstain. The exception for statutes that are " 'flagrantly and patently violative....' " (*Huffman supra*) shall first be discussed.

Hood argues that Maine's interpretation and application of the applicable state laws are unconstitutional, thus precluding applicability of *Younger* abstention. Hood misstates the *Younger* exception. In particular, the *Younger* exception for unconstitutional statutes focuses on the statutory language, while Hood is focusing its arguments on the application of the statutes to itself.

*Younger* specifically and narrowly defined its exception for unconstitutional statutes. (*Huffman supra*). *Younger* made sure to explain that the "flagrantly and patently violative ..." language (*Huffman supra*) was neither verbal artistry nor hyperbole: We hold "that the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good faith attempts [in a pending state court proceeding] to enforce it...." *Younger* 401 U.S. at 54, 91 S.Ct. at 755. The Supreme Court again emphasized this point in a later case, referring to *Younger:* "But we unequivocally held that facial invalidity of a statute is not itself an exceptional circumstance justifying federal interference with state criminal proceedings." *Huffman*, 420 U.S. at 602, 95 S.Ct. at 1207.

If other conditions of *Younger* are met, therefore, a federal court must abstain even if it considers a challenged statute to be unconstitutional on its face. More is required. That statute must additionally be " 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' " (*Huffman supra*). The rationale is explained in *Younger*, 401 U.S. at 52–53, 91 S.Ct. at 754–55.

That is an exceedingly tough standard to meet. *Trainor* is illustrative. In *Trainor*, noting that the "flagrantly and patently violative ..." standard was not met, the

Supreme Court held that the lower federal court should have abstained under *Younger*, even though that lower federal court had found the applicable state law unconstitutional. *Trainor*, 431 U.S. at 439, 446–47, 97 S.Ct. at 1915, 1919–20. *Trainor* is not an isolated example. The same happened similarly in *Huffman*, *Moore*, and *Pennzoil*.

The challenged state milk laws do not meet the "flagrantly and patently violative" standard. Hood attempts to demonstrate the applicability of the *Younger* exception for unconstitutional statutes by addressing the merits of its claims. That approach, however, was rejected in *New Orleans*. *New Orleans*, 491 U.S. at 364–65, 109 S.Ct. at 2515–16. Even if Hood were able to show that the Maine milk laws, as applied to Hood, were unconstitutional, that would not be enough. Hood must show that the statute is " 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' " (*Huffman supra*). *New Orleans* explains:

> [T]he mere assertion of a substantial constitutional challenge to state action will not alone compel the exercise of federal jurisdiction. See *Younger*, 401 U.S. at 53 [91 S.Ct. at 755]. That is so because when we inquire into the substantiality of the State's interest in its proceedings we do not look narrowly to its interest in the *outcome* of the particular case—which could arguably be offset by a substantial federal interest in the opposite outcome. Rather, what we look to is the importance of the generic proceedings to the state.

*New Orleans*, 491 U.S. at 365, 109 S.Ct. at 2516.

Hood, in particular, has not shown, nor even attempted to show, that "every clause, sentence and paragraph" (*Huffman supra*) is constitutionally violative.[3] Indeed, the Maine state court upheld the constitutionality of the Maine Milk Pool law, 7

---

**3.** Although not an abstention case, *Board of* *Airport Commissioners of the City of Los Angeles*

M.R.S.A. § 3151 et seq., in *Maine Milk Producers*, 483 A.2d 1213. In the context of a motion for a preliminary injunction, this court in *Crane*, 602 F.Supp. 280, held that those plaintiffs would not likely be able to show that the Maine Milk Pool law was preempted by the Agricultural Marketing Agreement Act. Also, the Maine court upheld the constitutionality of the Maine Milk Commission law, 7 M.R.S.A. § 2951 et seq., in *Maine Milk Commission v. Cumberland Farms Northern, Inc.*, 160 Me. 366, 205 A.2d 146 (1964). While those cases did not address the particular issue now pending before the state court, those cases, in upholding the constitutionality of the Maine Milk laws, do go toward showing that the challenged statutes are not unconstitutional in "every clause, sentence and paragraph" (*Huffman supra*). Cf. *Pearce v. Freeman*, 238 F.Supp. 947 (E.D.La.1965), discussed in *Schwegmann Brothers Giant Super Markets v. Louisiana Milk Commission*, 365 F.Supp. 1144, 1157 (M.D.La. 1973), *affirmed*, 416 U.S. 922, 94 S.Ct. 1920, 40 L.Ed.2d 279 (1974) (*Schwegmann* noted that the state milk regulation involved in the *Pearce* case was in "direct conflict" with the federal milk regulation; that compliance with the state regulation could result only by disobeying the federal regulation).

Nor has Hood shown the challenged statutes to be constitutionally violative " 'in

*v. Jews for Jesus, Inc.*, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) is instructive because it involved a resolution that this court feels reasonably exemplifies the "flagrantly and patently violative ..." (*Huffman supra*) standard required to meet the constitutionality exception of *Younger*. The petitioners in that case, the Board of Airport Commissioners, adopted a resolution which provided, in pertinent part, that "the Central Terminal Area at Los Angeles International Airport [LAX] is not open for First Amendment activities by any individual and/or entity...." *Airport Commissioners*, 482 U.S. at 570–71, 107 S.Ct. at 2570 quoting Resolution No. 13787 of the Board of Airport Commissioners, adopted July 13, 1983. In holding that the resolution was unconstitutional on its face under the overbreadth doctrine of the First Amendment, the court explained its reasoning in language that closely approximates the "flagrantly and patently violative ..." (*Huffman supra*) standard, at least for

whatever manner and against whomever an effort might be made to apply it.' " (*Huffman supra*). That is, even if Hood were to have shown that the statutes are unconstitutional as applied to Hood under the facts and issues presented in the state court proceeding, Hood has not shown that there are no alternative reasonable interpretations that the state court could adopt to make the statutes constitutional. Relevant to that notion, the Supreme Court states: "Another important reason for abstention is to avoid unwarranted determination of federal constitutional questions." *Pennzoil*, 481 U.S. at 11, 107 S.Ct. at 1526. The rationale is the following:

> When federal courts interpret state statutes in a way that raises federal constitutional questions, "a constitutional determination is predicated on a reading of the statute that is not binding on state courts and may be discredited at any time—thus essentially rendering the federal-court decision advisory and the litigation underlying it meaningless." *Moore v. Sims*, 442 U.S. 415, 428 [99 S.Ct. 2371, 2379, 60 L.Ed.2d 994] (1979). See *Trainor v. Hernandez*, 431 U.S. 434, 445 [97 S.Ct. 1911, 1919, 52 L.Ed.2d 486] (1977).

*Pennzoil*, 481 U.S. at 11, 107 S.Ct. at 1526 (accompanying footnote included in footnote here).[4] *Moore* further explains:

illustrative purposes here. *See Airport Commissioners*, 482 U.S. at 574–76, 107 S.Ct. at 2572–73.

4. The accompanying footnote of the above quoted passage from *Pennzoil*, 481 U.S. at 11, 107 S.Ct. at 1526 is pertinent here:

> In some cases, the probability that any federal adjudication would be effectively advisory is so great that this concern alone is sufficient to justify abstention, even if there are no pending state proceedings in which the question could be raised. See *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 [61 S.Ct. 643, 85 L.Ed. 971] (1941).... We merely note that considerations similar to those that mandate *Pullman* abstention are relevant to a court's decision whether to abstain under *Younger*. Cf. *Moore v. Sims*, 442 U.S. 415, 428 [99 S.Ct. 2371, 2379, 60 L.Ed.2d 994] (1979). The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a com-

State courts are the principal expositors of state law. Almost every constitutional challenge ... offers the opportunity for narrowing constructions that might obviate the constitutional problem and intelligently mediate federal constitutional concerns and state interests.

*Moore*, 442 U.S. at 429–30, 99 S.Ct. at 2380. *See also Houston*, 482 U.S. at 468, 107 S.Ct. at 2513 ("If the statute is not obviously susceptible of a limiting construction, then even if the statute has 'never [been] interpreted by a state tribunal ... it is the duty of the federal court to exercise its properly invoked jurisdiction.'") (citations omitted).

Hood claims that there are no unresolved issues of state law, making abstention therefore inappropriate. This claim might be regarded either as another exception to the abstention doctrine or a prerequisite. *Houston* states: "'Where there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim.'" *Houston*, 482 U.S. at 468, 107 S.Ct. at 2513 quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971).

Nevertheless, Hood's claim that there are no unresolved issues of state law is without merit. Hood bases this argument on its narrow interpretation of an ambiguous answer of Maine to Hood's federal complaint, and alleged prior interpretation of the statute. The pleadings on the whole, however, clearly indicate a controversy over proper interpretation of the state milk statutes and regulations and their interaction with the federal milk laws. Furthermore, even if Maine has previously interpreted the laws in a certain manner, that would not prevent Maine from changing its position based on its reassessment of the governing statutes. Specifically, the state court has never interpreted the appli-

cable state statutes in the context of this dispute: whether a party may be subject to state milk regulation at the same time that the party is subject to federal milk regulation. For instance, Maine points to ambiguities in the definitions of "Maine Market dealer," "Boston Market dealer," "Maine Market producer," and "Boston Market producer," found in 7 M.R.S.A. § 3152, that need interpretation by the state court.

Therefore, the challenged state statutes may be ambiguous, at least in the context of the pending state court suit. Resolution of the state law questions would facilitate the resolution of the federal law and constitutional questions or obviate the need to do so. On that basis, the federal court cannot fail to abstain.

Closely related to the unconstitutionality issue is Hood's preemption claim. Hood's preemption claim is based on the argument that it cannot be subject to state regulation at the same time it is subject to federal regulation. Hood argues that when a federal preemption claim is raised, federal courts need not abstain under *Younger*. Hood cites no First Circuit or Supreme Court cases directly supporting this proposition, nor could this court find any.

*New Orleans*, in fact, soundly rejected that reasoning:

[C]onstitutional challenges to state action, no less than pre-emption-based challenges call into question the legitimacy of the State's interest in its proceedings reviewing or enforcing that action. Yet it is clear that the mere assertion of a substantial constitutional challenge to state action will not alone compel the exercise of federal jurisdiction.

*New Orleans*, 491 U.S. at 365, 109 S.Ct. at 2516, citing *Younger*, 401 U.S. at 53, 91 S.Ct. at 755.

---

plex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes.

*Pennzoil*, 481 U.S. at 11 n. 9, 107 S.Ct. at 1526 n. 9. Maine does argue the *Pullman* and *Burford* [derived from *Burford v. Sun Oil Co.*, 319 U.S.

315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)] abstention doctrines as well as the *Younger* abstention doctrine. However, since the case can be decided solely on the basis of the *Younger* abstention doctrine, the other abstention doctrines need not be considered.

Having settled that the *Younger* abstention doctrine generally applies to preemption as well as constitutionally based challenges to state action (*New Orleans supra*), *New Orleans* next addressed the effect of the strength of the preemption claim on the application of *Younger:*

> ... NOPSI [New Orleans Public Service, Inc.] asserts that *Younger's* posited exception for state statutes "flagrantly and patently violative of express constitutional prohibitions" ought to apply equally to state proceedings and orders flagrantly and patently violative of federal pre-emption (which is unlawful only because it violates the express constitutional prescription of the Supremacy Clause). Thus, NOPSI argues, even if a *substantial* claim of federal preemption is not sufficient to render abstention inappropriate, at least a *facially conclusive* claim is. Perhaps so. But we do not have to decide the matter here....

*New Orleans*, 491 U.S. at 366–67, 109 S.Ct. at 2517 (emphasis in original). *New Orleans* seems to acknowledge, in the above language, that a "substantial claim of federal pre-emption is not sufficient to render abstention inappropriate," while reserving for another day the question of whether a "facially conclusive claim is." (*New Orleans supra*). In so doing, *New Orleans* distinguishes between two standards: the more difficult to prove "flagrantly and patently violative" standard, which *New Orleans* equates to "facially conclusive," and the easier to prove "substantial" standard. (*New Orleans*, 491 U.S. at 366–67, 109 S.Ct. at 2517 *supra*). Therefore, in analyzing Hood's preemption exception claim to *Younger*, this court will assume that Hood is alleging a standard that is at least greater than "substantial," though not necessarily equal to "facially conclusive," or "flagrantly and patently violative." *New Orleans* did not clarify the practical difference between the two standards, however. That is of no concern, fortunately, since *New Orleans* elsewhere provides sufficiently more guidance. (*Infra*).

The position of the First Circuit on whether there is a preemption exemption to the *Younger* doctrine remains unresolved: "We express no opinion as to ... whether or not there should be a preemption exception to the *Younger* abstention doctrine." *Marcal Paper Mills, Inc. v. Ewing*, 790 F.2d 195, 198 (1st Cir.1986). The *Marcal* court did note, however, that "the presence of federal preemption defenses was not sufficient to" make abstention inappropriate. *Marcal*, 790 F.2d at 198 citing *Puerto Rico International Airlines, Inc. v. Silva Recio*, 520 F.2d 1342 (1st Cir.1975).

Looking at a preemption claim in the context of *Younger* abstention, *New Orleans* instructs that the interest of the state in the challenged state action or proceeding is examined in the same manner as it is for resolving the *Younger* question itself. *New Orleans*, 491 U.S. at 365, 109 S.Ct. at 2516 ("[P]re-emption-based challenges merit a similar focus ..."). Thus, the court's analysis and discussion of whether there exists an important state interest qualifying for *Younger* abstention applies here as well. (discussion of state interests in *Younger* analysis, *supra*).

That means that Hood, in its preemption exception claim to *Younger*, must more than merely show that the federal milk laws preempt Maine's particular claim in state court: Hood is required to show that the federal laws preempt the state's interests protected by the Maine milk laws.

Hood has not shown that the federal laws or constitution preempt the interests protected by Maine's milk laws. Instead, Hood referred to the merits of its case. *New Orleans* rejected that approach, reasoning, as explained above, that in a preemption exception claim to *Younger*, the focus is not on the outcome of a particular proceeding. "Rather, what we look to is the importance of the generic proceedings to the state." *New Orleans*, 491 U.S. at 365, 109 S.Ct. at 2516; (discussion of state interest in *Younger* analysis, and discussion of preemption, *supra*).

Additionally, courts have examined state milk laws and found them not to be generally preempted by federal law. *Crane v.*

*Commissioner of Department of Agriculture, Food and Rural Resources,* 602 F.Supp. 280, 290–93 (Me.1985) held that the Maine Milk Pool Act was not preempted by the Agricultural Marketing Agreement Act. *See also United Dairy Farmers Cooperative Association v. Milk Control Commission of the Commonwealth of Pennsylvania,* 335 F.Supp. 1008 (M.D.Pa. 1971), *affirmed,* 404 U.S. 930, 92 S.Ct. 280, 30 L.Ed.2d 244 (1971); *Schwegmann Brothers Giant Super Markets v. Louisiana Milk Commission,* 365 F.Supp. 1144 (M.D.La.1973), *affirmed,* 416 U.S. 922, 94 S.Ct. 1920, 40 L.Ed.2d 279 (1974). While those cases involved particular issues different from the one pending before the state court, those cases at least go toward showing that the generic state interests are not preempted by the federal milk laws.

A comparative analysis of the Maine milk pool laws with the federal milk laws shows that the Maine milk laws were designed to interact, and not interfere with the federal laws. The Maine milk laws, for instance, refer to the federal laws, accommodating the federal interests. The impetus for the Maine Milk Pool law was the fact of disparate treatment of dairy farmers selling into the federally controlled market. The legislative findings (7 M.R.S.A. § 3151) and definitions (7 M.R.S.A. § 3152), for instance, show that the Maine Milk Pool law was designed in contemplation of the federal milk laws. Hood's contention that the federal laws preempt the interests protected by the Maine milk laws to a degree precluding abstention, therefore, is without merit.

Hood also argues that the federal court has exclusive jurisdiction to enforce or prevent the violation of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 601 et seq., relying on the Ninth Circuit case of *Western Fruit Growers, Inc. v. United States,* 124 F.2d 381 (9th Cir.1941). Hood's reliance on that case is misplaced.

The complaint in *Western Fruit* was a federal cause of action, brought under the Agricultural Marketing Agreement Act of 1937. *Western Fruit,* 124 F.2d at 383.

Here, in contrast, Maine's cause of action in state court is based on state law, under the Maine milk laws. Maine clearly states that it is not relying on or challenging the federal milk laws. Of course, the state court may have to collaterally consider the interaction of the state milk laws with the federal milk laws in deciding the constitutionality of the Maine milk laws. But that type of consideration would still not make the *Western Fruit* case relevant.

Where consideration of a federal law claim is collateral to a claim based on state law, the Supreme Court said: "[E]ven a finding of exclusive federal jurisdiction over claims arising under a federal statute usually 'will not prevent a state court from deciding a federal question collaterally.'" *Hathorn v. Lovorn,* 457 U.S. 255, 266, 102 S.Ct. 2421, 2428, 72 L.Ed.2d 824 (1982) citing and quoting *Gulf Offshore v. Mobil Oil Corp.,* 453 U.S. 473, 483 n. 12, 101 S.Ct. 2870, 2878 n. 12, 69 L.Ed.2d 784 (1981) (footnote omitted).

For example, in a case in which the petitioners argued, on the basis of language in a federal statute, that a state court did not have jurisdiction to hear a party's state law claim, the Supreme Court stated:

> [Q]uestions of exclusive federal jurisdiction and ouster of jurisdiction of state courts are, under existing jurisdictional legislation, not determined by ultimate substantive issues of federal law. The answers depend on the particular claims a suitor makes in a state court—on how he casts his action. Since "the party who brings a suit is master to decide what law he will rely upon," *The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25 [33 S.Ct. 410, 411, 57 L.Ed. 716] [1913]....

*Pan American Petroleum Corp. v. Superior Court of Delaware for New Castle County,* 366 U.S. 656, 662, 81 S.Ct. 1303, 1307, 6 L.Ed.2d 584 (1961). Maine is not questioning the applicability of federal milk regulations. Rather, Maine is asserting that Hood can be regulated under state milk laws even while Hood is subject to the federal milk regulations. *See,* n. 1 at p. 665, *supra.* Hood insists that Maine has

not clearly articulated its legal reasoning. *See, e.g.,* Plaintiff's [Hood's] Memorandum in Support of Opposition to Defendant's Motion for Judgment on the Pleadings, p. 1–2. But, Hood's filings with the court demonstrate that it does understand the basic nature of the dispute and the underlying issue. (See discussion of the third *Middlesex* factor, *supra;* and discussion of bad faith *Younger* exception, *infra*). The court concludes that jurisdiction is not exclusively federal.

 Hood also raises the "bad faith" exception to the *Younger* doctrine. For the "bad faith" exception to the *Younger* doctrine to apply, the Supreme Court requires the same level, or requirements, of "bad faith" whether abstention is to a pending state criminal or civil proceeding. *Trainor* and *Juidice* involved abstention to pending civil proceedings. In their discussions of the bad faith *Younger* exception, *Trainor* and *Juidice* endorsed the same showing of bad faith as that required for pending criminal proceedings. *Trainor* did that by citing *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), a companion case to *Younger;* and *Juidice* by citing *Cameron v. Johnson,* 390 U.S. 611, 619, 88 S.Ct. 1335, 1339, 20 L.Ed.2d 182 (1968), which in turn is cited with approval by *Younger,* 401 U.S. at 49, 91 S.Ct. at 753 in its discussion of bad faith. *Perez* and *Cameron* both involved abstention to criminal proceedings.

The Supreme Court explains the bad faith exception as follows:

In the companion case of *Perez v. Ledesma,* 401 U.S. 82 [91 S.Ct. 674], the Court explained that '[o]nly in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate.' *Id.,* at 85 [91 S.Ct. at 677]. See *Mitchum v. Foster,* 407 U.S. 225, 230–231 [92 S.Ct. 2151, 2155–2156, 32 L.Ed.2d 705] [1972].

. . . .

"... The very nature of 'extraordinary circumstances,' of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state criminal proceedings. [Footnote omitted.] But whatever else is required, such circumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation."

*Trainor,* 431 U.S. at 442 n. 7, 97 S.Ct. 1917 n. 7 quoting *Kugler v. Helfant,* 421 U.S. 117, 124–25, 95 S.Ct. 1524, 1530–31, 44 L.Ed.2d 15 (1975). *Juidice* refers to *Cameron,* 390 U.S. at 619, 88 S.Ct. at 1339 to suggest the required level of bad faith. In order for the appellants in the *Cameron* case to justify federal intervention, the Supreme Court explained, they had to show that statute was enforced against them "in bad faith ... with no intention of pressing the charges or with no expectation of obtaining convictions, knowing that appellants' conduct did not violate the statute." *Cameron,* 390 U.S. at 619–20, 88 S.Ct. at 1339–40. *See also Huffman,* 420 U.S. at 602, 611, 95 S.Ct. at 1207, 1211 (referring to the *Younger* exceptions as "narrow").

*Younger* relates the factual circumstances of *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) to illustrate the bad faith exception. The appellants in *Dombrowski* offered to show that even after a

state court order quashing the warrants and suppressing the evidence seized, the prosecutor was continuing to threaten to initiate new prosecutions of appellants under the same statutes, was holding public hearings at which photostatic copies of the illegally seized documents were being used, and was threatening to use other copies of the illegally seized documents to obtain grand jury indictments against the appellants on charges of violating the same statutes.

*Younger,* 401 U.S. at 48, 91 S.Ct. at 752 (relating facts of *Dombrowski* ). Those cir-

cumstances, *Younger* suggested, illustrate "the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought in good faith, that had always been considered sufficient to justify federal intervention." *Younger*, 401 U.S. at 48, 91 S.Ct. at 752 (discussing factual circumstances of *Dombrowski*) (citing *Beal v. Missouri Pacific Railroad Corp.*, 312 U.S. 45, 50, 61 S.Ct. 418, 421, 85 L.Ed. 577 (1941)).

" 'These exceptions to *Younger's* policy of abstention have been very narrowly construed by the Court.' " *Bettencourt*, 904 F.2d at 779 quoting *United Books, Inc. v. Conte*, 739 F.2d 30, 34 (1st Cir.1984). *Bettencourt* is a decision involving the application of the *Younger* abstention doctrine to a pending civil proceeding; *United Books* involves the application of the *Younger* abstention doctrine to criminal prosecutions. Since *Bettencourt* cites *United Books* with approval, presumably the First Circuit requires the same showing of bad faith to justify an exception to an otherwise valid abstention claim whether abstention is to a criminal or civil proceeding:

> These exceptions to *Younger's* policy of abstention have been very narrowly construed by the Court. *See, e.g., Kugler v. Helfant*, 421 U.S. 117, 126 n. 6 [95 S.Ct. 1524, 1531 n. 6, 44 L.Ed.2d 15] (1975) (" 'bad faith' in this context generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction"); *Perez v. Ledesma*, 401 U.S. 82, 83, 85 [91 S.Ct. 674, 675, 676, 27 L.Ed.2d 701] (1971) ("[o]nly in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction ... is federal ... relief against pending state prosecutions appropriate"). *See also* C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4255 (1978 & Supp. 1984) ("what the Court has done confirms that the Court is right when it describes [the exceptions to *Younger*] as 'these narrow exceptions' " (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611 [95 S.Ct. 1200, 1211, 43 L.Ed.2d 482] (1975))).

*United Books*, 739 F.2d at 34. Assuming the state interest in a pending civil matter is found to be sufficiently important and substantial to justify the application of the *Younger* abstention doctrine, it rationally follows that the analysis of the application of the bad faith exception to the doctrine should be the same as the courts have followed in matters involving state criminal proceedings.

Hood alleges Maine's bad faith in two ways. Hood's first bad faith claim is that Maine has poorly articulated its legal reasoning for the state court claim thereby placing Hood to a disadvantage. Hood's second bad faith claim is that Maine's interpretation of the Maine milk laws now is different from its prior interpretation.

The court, in looking at the arguments on which Hood bases its bad faith claims for the *Younger* exception, concludes that an extension of time would be futile. That is because Hood's bad faith claims, even if taken to be true, do not approach the egregious standard enunciated above. Regarding Maine's allegedly poor articulation of its legal position, there is nevertheless enough presented for Hood to understand the basic nature of the suit brought against it. In particular, Hood realizes that Maine's claim is based on the Maine milk laws; that Maine is seeking money from Hood for a period of time during which Hood knows that it was subject to the federal milk laws; that Maine is claiming that Hood was subject to Maine milk laws irrespective of whether Hood was subject to the federal milk laws during the disputed period; that Maine is not questioning the authority of the federal milk laws; and that the state court may consider Hood's constitutional as well as other objections in resolving the matter. Regarding Maine's allegedly prior inconsistent interpretation of the state milk laws and their interaction with the federal milk laws, even if that were taken to be true, Maine's reversal in the interpretation does not necessarily indicate bad faith. Maine may very well have reconsidered its prior interpretation and determined that it was wrong.

In its request for additional time to support its bad faith claims for the *Younger*

exception, Hood does not suggest that Maine brought its action in state court under a statute that was enforced against them "with no expectation" or "without hope" of being successful on its claim; nor did Hood suggest that Maine initiated the state court action "knowing that [Hood's] conduct did not violate the statute." (*See* discussion of bad faith exception to *Younger, supra*). Hood has not pointed to anything which suggests that the circumstances under which Maine initiated the state court action illustrate "the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought in good faith, that had always been considered sufficient to justify federal intervention." (*Younger*, 401 U.S. at 48, 91 S.Ct. at 752 *supra*).

Hood requests additional time for discovery to investigate the bad faith exception to the *Younger* doctrine. Hood has submitted copies of transcripts of certain depositions which it seeks to use to support its bad faith argument. Because I conclude that Hood's articulated bad faith argument, even if accepted at face value, does not set forth a bad faith claim sufficient to preclude abstention, I find that the extraneous material submitted by Hood should be excluded and the motion for judgment on the pleadings should not be converted to a motion for summary judgment pursuant to Fed.R.Civ.P. 12(c).

In summary, I conclude that the state's interest in the application and functioning of its milk laws concurrently with the federal milk laws is sufficiently important and substantial to override the strong presumption that a federal court should accept and exercise jurisdiction over a matter which lies within its subject matter jurisdiction. Here, this court clearly has subject matter jurisdiction over the issues presented by the plaintiff's complaint, but, in view of the state's interest in the matters addressed by the pending state action, I conclude that the requisite foundation for application of the *Younger* abstention doctrine is present. For the reasons set forth, I conclude that this court should abstain under the *Younger* abstention doctrine.

Accordingly, I recommend that the defendants' motion for judgment on the pleadings be *GRANTED* and that the complaint be dismissed without prejudice.

### Notice

A party may file objections to those specified portions of this report or proposed findings or recommended decision for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten days after being served with a copy hereof. A responsive memorandum shall be filed within ten days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

Dated at Bangor, Maine, this 21st day of March, 1991.

/s/ <u>Edward H. Keith</u>
Edward H. Keith
United States Magistrate Judge