1997 ME 104

**HANOVER INSURANCE CO.**

v.

**WORKERS' COMPENSATION BOARD**

Supreme Judicial Court of Maine.

Argued Dec. 2, 1996.

Decided May 16, 1997.

Charles C. Soltan (orally), Seth W. Brewster, Verril & Dana, Portland, for plaintiff.

Julia A. Finn (orally), General Counsel, Workers' Compensation Board, Augusta, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, and LIPEZ, JJ.

LIPEZ, J.

[¶ 1] The Workers' Compensation Board appeals from a decision of the Superior Court (Kennebec County, *Atwood, J.*), vacating a Board assessment against Hanover Insurance Co. for the 1995 fiscal year. P.L.1993, ch. 619 (effective April 7, 1994) (codified as 39–A M.R.S.A. § 154 (Supp.1994)), *repealed and replaced* by P.L.1995, ch. 59, § 1. The Board contends that the Superior Court lacked subject matter jurisdiction to review the Board's assessment pursuant to the Maine Administrative Procedure Act, 5 M.R.S.A. § 11001(1) (1989). Since Hanover failed to file a timely petition for appellate

review with the Law Court pursuant to 39–A M.R.S.A. § 322 (Supp.1996), the Board further contends that its decision is final. *Guaranty Fund Management Servs. v. Workers' Comp. Bd.,* 678 A.2d 578, 582 (Me. 1996). The Board also contends that, even if the Superior Court had jurisdiction to review the assessment, the assessment was valid and should have been upheld. We disagree with the contentions of the Board and affirm the judgment.

[¶ 2] The Board's funding is provided through assessments levied against self-insured employers and insurance companies, who pass the assessment through to their insured employers. 39–A M.R.S.A. § 154 (Supp.1996). The assessment is based on the insurers' and self-insured employers' pro rata share of the total premium volume for all workers' compensation insurers doing business in the state, and the total aggregate benefits paid by all in-state self-insured employers, during the previous year. 39–A M.R.S.A. § 154(5). Prior to the creation of the Board in 1993, Hanover was a major servicing carrier in the workers' compensation insurance residual market safety pool. 24–A M.R.S.A. § 2366, *repealed by* P.L.1991, ch. 885, § B–11. In 1993, operating pursuant to the original version of section 154, the Board calculated a $1.68 million assessment against Hanover based on its premium volume for 1992. Because Hanover lost a large share of its premium volume when the residual market mechanism was eliminated in 1993, Hanover was unable to collect its entire assessment obligation from its insured employers in 1993.

[¶ 3] Hanover and three other large insurance carriers filed petitions for reconsideration with the Board challenging the assessment. The insurers contended that section 154 did not permit the Board to levy a specific dollar assessment against insurers, but required the Board to calculate a percentage rate assessment that insurers could apply against their insureds based on the premium volume for the current year. The Board denied the petitions and the insurers paid the assessment without appealing the decision. The Legislature amended the statute, however, in 1994. P.L.1993, ch. 619. The legislative purpose for the amendment is stated in the emergency preamble:

> **Whereas,** the Legislature intended that the assessment be a direct pass through to state employers such that insurers would suffer no financial loss as a result of the assessment; and

> **Whereas,** the implementation of the assessment by the ... Board has caused workers' compensation insurers to suffer financial loss ....

Emergency Preamble, P.L.1993, ch. 619.

[¶ 4] On May 2, 1994, the Board, now operating pursuant to the amended statute, sent notices of assessment to Hanover, stating that Hanover must pay $391,624 for the 1995 fiscal year. The Board arrived at this specific dollar amount by first calculating a percentage applicable to all insurers (1.4%) and then applying that percentage to Hanover's total premiums less dividends for the prior calendar year. Again, the large insurers disputed the assessment determination, contending that the Board should have assessed a percentage rate that the insurers could then apply to the premiums actually received in the 1995 fiscal year. Representatives of the Board met with four large insurance companies, including Hanover, several times over the course of the year to resolve the dispute. According to the Board, it decided to "agree to disagree" on the interpretation of the amended statute and to wait and see if the insurers' calculation method would bring in enough funds to meet the Board's $5.75 million budget. Hanover's quarterly assessment payments, based on 1.4% of its actual premium volume, fell far short of the Board's budget goals. Although the Board sought quarterly assessments of $97,906, Hanover paid $17,308 in the first quarter and $52,339 in the second quarter. On February 10, 1995 the Board issued an order stating that Hanover owed $126,165 in arrearages from the shortfall in its first two quarterly payments, and stating that "Hanover is hereby ordered to pay the arrearage in full on or before April 30, 1995 at which time the third quarter installment is also due."

[¶ 5] Hanover filed a petition for judicial review with the Superior Court pursuant to the Maine Administrative Procedure Act, 5

M.R.S.A. § 11001(1). On June 3, 1996, the Superior Court vacated the Board's February 10, 1995 order and the May 24, 1994 assessment, concluding that section 154 "unambiguously require[s] that the Board establish a percentage rate that is applied to an insurer's actual premiums in a particular quarter." The Board appeals from that decision.

### Appeal to the Superior Court

■ [¶ 6] The Maine Administrative Procedure Act provides: "Except where a statute provides for direct review or review of a pro forma judicial decree by the Supreme Judicial Court or where judicial review is specifically precluded or the issues therein limited by statute, any person who is aggrieved by final agency action shall be entitled to judicial review thereof in the Superior Court in the manner provided by this subchapter." 5 M.R.S.A. § 11001(1). The Board contends that pursuant to our recent decision in *Guaranty Fund*, 678 A.2d at 581, Hanover was limited to discretionary review in the Law Court pursuant to 39–A M.R.S.A. § 322, and therefore the Superior Court lacked authority to review the Board's assessment pursuant to the Maine Administrative Procedure Act. We disagree.

[¶ 7] Prior to 1993, a party was entitled to an appeal as of right from the decision of an individual commissioner to the former Workers' Compensation Commission Appellate Division, 39 M.R.S.A. § 103–B (1989), *repealed by* P.L.1991, ch. 885, § A–7, and a discretionary appeal to the Law Court after a decision by the Division. 39 M.R.S.A. § 103–C (1989), *repealed by* P.L.1991, ch. 885, § A–7; *Mathieu v. Bath Iron Works*, 667 A.2d 862, 865(Me.1995). When the Appellate Division was eliminated in 1993, the Legislature provided for discretionary review to the full Board when a hearing officer requests such review, based on a determination that the decision "involves an issue that is of significance to the operation of the workers' compensation system," 39–A M.R.S.A. § 320, and discretionary review in the Law Court from any decision of a hearing officer or the Board "if the board has reviewed a [hearing officer's] decision pursuant to section 320," 39–A M.R.S.A. § 322. *Mathieu*, 667 A.2d at 865.

[¶ 8] Pursuant to the plain language of section 322, because the assessment determination did not involve a decision of a hearing officer, or a review of a hearing officer's decision by the Board pursuant to section 320, the discretionary review procedure provided in section 322 does not apply to assessment decisions of the Board. Accordingly, because the Act is silent regarding judicial review of assessment decisions, the decision was properly appealed to the Superior Court pursuant to the Maine Administrative Procedure Act. 5 M.R.S.A. § 11001(1).

[¶ 9] We do not agree that our decision in *Guaranty Fund*, 678 A.2d at 582, compels a different result. In that case, we held that forfeiture decisions of the Workers' Compensation Board Abuse Unit, although not technically decisions of a hearing officer or the Board pursuant to section 320, are nevertheless subject to discretionary review in the Law Court pursuant to section 322. *Id.* We stated:

Although section 322 does not expressly provide for Law Court review of Abuse Unit decisions, section 323, governing the Superior Court's enforcement authority, expressly provides that '[a]ppeals from a board decision, order or agreement must be in accordance with section 322.' 39–A M.R.S.A. § 323. Because the Abuse Unit was acting pursuant to the delegation of authority from the Board, the forfeiture orders were tantamount to decisions of the Board and therefore reviewable by the Law Court.

*Id.* at 581. Relying on the above-quoted language from *Guaranty Fund*, the Board contends that the last sentence of section 323 expands the Law Court's appellate authority beyond the strict requirements of section 322, making Law Court review no longer contingent upon a prior decision of a hearing officer.

■ [¶ 10] The Board reads the last sentence of 323, and our decision in *Guaranty Fund*, too broadly. Section 323 provides limited authority in the Superior Court to enter pro forma decrees to enforce Board decisions. *Beaulieu v. Dirigo Housing Assocs.*, 648 A.2d 968, 969 (Me.1994). The last sen-

tence of section 323 was intended to clarify that the grant of authority to enforce Board decisions should not be construed as a grant of authority in the Superior Court to review those decisions on the merits. *Beaulieu,* 648 A.2d 968, 969 (Me.1994); *Banker v. Bath Iron Works Corp.,* 507 A.2d 602, 604 (Me. 1986). Section 323 was not intended to provide an independent grant of authority in the Law Court to review Board decisions. This purpose is manifest in its plain language, providing that "[a]ppeals from a board decision, order or agreement *must be in accordance with section 322."* 39–A M.R.S.A. § 323.

[¶ 11] Our decision in *Guaranty Fund* was inextricably tied to the section 324 forfeiture context. 678 A.2d at 581–82. As we explained, because forfeiture decisions were traditionally rendered by commissioners, they were automatically eligible for discretionary Law Court review under former section 103–C. 39 M.R.S.A. § 103–C (1989). It was only after the Board chose to delegate forfeiture authority to an Abuse Unit, instead of individual hearing officers, that the issue of appellate review arose. *Id.* Based on the unbroken history of Law Court review of forfeiture decisions, we concluded that the Legislature did not intend "to significantly alter the appellate procedure for forfeitures that existed under the prior Act," nor did it intend to permit "workers' compensation appellate procedure to hinge on the fortuity of whether the Board delegates the authority to assess a forfeiture to a hearing officer or to some other individual or entity." *Id.* at 582. We found further support from policy considerations in the forfeiture context. As we stated, "[t]o provide for an automatic appeal of forfeiture decisions in the Superior Court, followed by an appeal as of right to the Law Court, would accord an enhanced right of judicial review not afforded to other workers' compensation litigants. We do not presume that the Legislature intended to provide an extra layer of appellate review in forfeiture proceedings that are designed primarily to encourage the prompt and timely payment of benefits...." *Id.*

[¶ 12] None of the reasons that we cited in *Guaranty Fund* in support of discretionary Law Court review of Abuse Unit penalty decisions are present in the assessment context. Unlike the forfeiture situation, the Commission/Board did not render assessments prior to the enactment of title 39–A, and, therefore, there is no time-honored practice regarding appellate review of Board assessment decisions. Although the Legislature has traditionally sought to limit Superior Court involvement in workers' compensation proceedings, Superior Court review is traditionally available in the context of assessment determinations involving insurers.[1] More importantly, assessment determinations do not involve an inquiry into the circumstances of an individual employee's claim for benefits, a role traditionally delegated to individual hearing officers.[2] Assessments are based on a system-wide analysis of the insurance market, and are applicable to all insurers providing coverage in the state. In all likelihood, therefore, the Legislature envisioned that assessment determinations would be conducted by the full Board, as was done here, and not by individual hearing officers. We see no evidence that the Legis-

---

1. *See, e.g.,* 24–A M.R.S.A. § 237 (Supp.1996) (assessment to fund the Bureau of Insurance); 24–A M.R.S.A. § 4609 (Supp.1996) (assessment to fund the Maine Life and Health Guaranty Association); 39–A M.R.S.A. § 409 (Supp.1996) (assessment by Superintendent of Insurance to fund the Self-Insurer's Workers' Compensation Program). Decisions of the Superintendent of Insurance may be appealed to the Superior Court pursuant to the Maine Administrative Procedure Act. 24–A M.R.S.A. § 236 (1989).

2. Neither party contends that the assessment determination was an adjudicatory proceeding. The Maine Administrative Procedure Act defines an "adjudicatory proceeding" as "any proceed-ing before an agency in which the legal rights, duties or privileges of specific persons are required by constitutional law or statute to be determined after an opportunity for a hearing." 5 M.R.S.A. § 8002(1) (1989). *Cumberland Farms Northern v. Maine Milk Comm'n,* 428 A.2d 869, 874 (Me.1981); *Hale v. Petit,* 438 A.2d 226, 231 (Me.1981); *see generally* 2 K.C. Davis, Administrative Law, § 7.2–7.3 (2d Ed.1979). Adjudicatory proceedings of the Board are expressly excluded from the application of the Administrative Procedure Act. 5 M.R.S.A. § 9051(1) (Supp.1996) ("In any adjudicatory proceedings, except those proceedings involving ... the Workers' Compensation Board ..., the procedures of this subchapter apply").

lature intended section 322, expressly permitting discretionary Law Court review from decisions of hearing officers, to apply to assessment determinations of the full Board. Accordingly, we conclude that Hanover's challenge to the Board's assessment was properly before the Superior Court pursuant to the Administrative Procedure Act.

## The Assessment

[¶ 13] The Board contends that, pursuant to the plain language of section 154, the assessment must be expressed in terms of a specific dollar amount, calculated according to each insurer's premium volume for the previous year.[3] We disagree. The first sentence of subsection 3(B) provides that the "assessment must be a *percentage* of gross direct premiums written ..." 39–A M.R.S.A. § 154(3)(B). We agree with the Superior Court that the word "percentage" suggests a percentage *rate*, not a specific dollar amount. Our conclusion is also supported by subsection 3(D), requiring insurers to "remit payment of the assessment *based upon the results for the quarter reported.*" 39–A M.R.S.A. § 154(3)(D). This language is not consistent with the Board's interpretation that the assessment must be expressed as a specific dollar amount based on each insurer's premium volume for the previous year. Pursuant to our interpretation, insurers are required to apply a Board-determined percentage rate to their own quarterly premium volume. While the percentage rate will stay the same over the course of the year, the assessment payment will vary from quarter-to-quarter, depending on each insurer's quarterly premiums, and, accordingly, insurers are required to "remit payment of the assessment *based upon the results for the quarter reported.*" 39–A M.R.S.A. § 154(3)(D). Our interpretation is also supported by analogy to 39–A M.R.S.A. § 404(4)(A)(2)(a) (Supp.1996). Subsection 404(4) permits the Maine Self–Insurance Guarantee Association to assess individual self-insurers "an amount equal to 1% of the annual standard premium that would have been paid by that individual self-insurer during the prior calendar year." 39–A M.R.S.A. § 404(4)(A)(2)(a). As Hanover contends, had the Legislature intended the section 154 assessment to be a dollar amount, as clearly required by section 404, the Legis-

---

**3.** The relevant version of section 154, as amended in 1994, provides, in pertinent part:

    **3. Assessment on workers' compensation insurance.** The following provisions apply regarding the Workers' Compensation Board assessment on workers' compensation insurance.

    **A.** Every insurance company or association that writes workers' compensation insurance in the State and that does business or collects premiums or assessments in the State shall pay to the board the assessment determined pursuant to this section for the purpose of providing partial support and maintenance of the board.

    **B.** The assessment must be a percentage of gross direct premiums written, whether in cash or in notes absolutely payable on contracts written on risks located or resident in the State for workers' compensation insurance, less the amount of the direct return premiums on the gross direct premiums written and all dividends paid to policyholders on direct workers' compensation premiums. In determining the assessment, consideration must be given to the balance in the Workers Compensation Board Administrative Fund.

    **C.** The assessment must be determined by the board by May 1st of each year. Insurance companies or associations must begin collecting the assessment from all employers on July 1st of each year.

    **D.** Every insurance company or association subject to the assessment imposed by this sec-

tion with an annual assessment of over $5,000 must on or before the last day of each January, each April, the 25th day of June and the last day of each October file with the board on forms prescribed by the board a return for the quarter ending the last day of the preceding month, except the month of June, which is for the quarter ending June 30th and remit payment of the assessment based upon the results for the quarter reported. A final reconciled annual return must be filed on or before September 15th covering the prior fiscal year in which the previous assessment was levied. Insurance companies or associations with an annual assessment of under $5,000 shall pay the assessment on or before June 1st.

    **4. Assessment on self-insured employers.** Every self-insured employer approved pursuant to section 403 shall ... pay an assessment on aggregate benefits paid by each member pursuant to section 404, subsection 4.

    . . .

    **6. Assessment levied.** The assessments levied under this section may not produce more than $6,000,000 in revenues annually beginning in the 1993–94 fiscal year. The board shall determine the assessments prior to May 1st and shall assess each insurance company or association and self-insured employer its pro rata share for expenditures during the fiscal year beginning July 1st ...

P.L. 1993, ch. 619, § 2.

lature could have drafted subsection 154(3)(B) to provide that "[t]he assessment must be [*an amount equal to*] a percentage of gross premiums written . . . ."

[¶ 14] The Board contends that its interpretation is supported by subsection 6 requiring the Board to make "assessment*s*" (plural) and to "assess *each* insurance company and self insured employer its pro rata share for expenditures during the fiscal year . . . ," 39–A M.R.S.A. § 154(6). The Board contends that the use of the plural and the word "each" in subsection 6 suggests that the assessment is not a single percentage to be applied globally to all insurance companies, but a dollar-specific assessment against *each* insurer separately. Subsection 6, unlike subsection 3, addresses both the insurers' assessment and the assessment against self-insured employers. The use of the plural in subsection 6, therefore, describes the assessments levied against insurers and self-insurers and does not suggest multiple dollar-specific assessments against individual insurers. Moreover, subsection 3(D), by contrast, begins: "Every insurance company or association subject to *the assessment* imposed by this section . . . ." 39–A M.R.S.A. § 154(3)(D) (emphasis added). Use of the word "the" instead of "an" to describe the assessment suggests a single assessment applicable to all insurers. Similarly, subsection C provides: "*The* assessment must be determined by the board by May 1st of each year. Insurance companies or associations must begin collecting *the* assessment from all employers on July 1st of each year." 39–A M.R.S.A. § 154(3)(C) (emphasis added).

[¶ 15] We also reject the Board's contention that subsection 3(D), requiring insurers with an assessment exceeding $5,000 to make quarterly assessment payments, supports the assessment of a specific dollar amount. 39–A M.R.S.A. § 154(3)(D). While it is true that an insurer cannot know with certainty if it will be assessed above the $5,000 threshold until the actual quarterly assessment payments are determined, we agree with the Superior Court that the Legislature could have intended that the determination to require quarterly assessment payments could be based on an estimate of the projected yearly assessment payments based on the prior year's premium volume. We do not agree that the uncertainty concerning whether an insurer's assessment payments will fall above or below $5,000 compels the conclusion that the assessment must be expressed in a specific dollar amount in the face of clear statutory language to the contrary.

[¶ 16] Although it is not necessary to examine other indicia of legislative intent when statutory language is unambiguous, *Jordan v. Sears Roebuck & Co.*, 651 A.2d 358, 360 (Me.1994), our interpretation finds strong support from the legislative history. After the Board levied a specific dollar assessment against insurers in 1993, the Legislature amended section 154 in 1994, stating in the Preamble that "the implementation of the assessment by the . . . Board has caused workers' compensation insurers to suffer financial loss. . . ." Emergency Preamble, P.L.1993, ch. 619. The preamble states further that the assessment is intended to "be a direct pass through to state employers such that insurers would suffer no financial loss as a result of the assessment." *Id.* As Hanover contends, the Board's interpretation does not meet the legislative goal of preventing insurers from incurring financial loss because an insurer that did more business the previous year will be assessed a higher dollar amount than it can bill its insureds.

[¶ 17] Section 154 was amended more recently in 1995. P.L.1995, ch. 59, § 1 (codified as 39–A M.R.S.A. § 154 (Supp.1996)). This amendment is illuminative because it unequivocally emphasizes that the insurers' assessment must be expressed as a percentage rate and not a specific dollar amount. The following under scored language was added to subsection 3(B): "The assessment must be *stated as* a percentage of *each employer's premium base*. In determining the assessment *percentage*, consideration must be given to the balance in the Workers' Compensation Board Administrative Fund." P.L.1995, ch. 59, § 1. Subparagraph 3(C) was amended as follows:

> For each fiscal year, the initial assessment *percentage* must be determined by the board by May 1st of *the prior fiscal* year. Insurance companies . . . must be-

gin collecting the *initial* assessment from al employers on July 1st of each year. *In establishing the assessment percentage, the board shall estimate the expected premium base for the upcoming fiscal year based on the returns filed under paragraph D and anticipated trends in the insurance market place.....*

(emphasis added.) P.L.1995, ch. 59, § 1.[4] The legislative history of the 1995 amendment suggests that it was intended to clarify the law, not alter it. The statement of fact provides: "Without this emergency legislation, *the basis for the assessment may be in doubt* and the services of the board may be seriously interrupted." L.D. 953, Statement of Fact (117th Legis.1995)(emphasis added).

[¶ 18] Because the Board is the administrative agency authorized to implement the workers' compensation law, we give deference to decisions of the Board interpreting the Act. *Curtis v. National Sea Prods.,* 657 A.2d 320, 322 (Me.1995); *LaRochelle v. Crest Shoe Co.,* 655 A.2d 1245, 1248 (Me.1995). We have stated, however, that " 'deference to the agency's construction must yield to the fundamental approach of determining legislative intent, particularly as it is manifest in the language of the statute itself.' " *Lewiston Raceway, Inc. v. Maine State Harness Racing Comm'n,* 593 A.2d 663, 665 (1991) (quoting *Central Me. Power Co. v. Maine Pub. Util. Comm'n,* 436 A.2d 880, 885 (Me.1981)). We are persuaded that the statutory language unambiguously requires the Board to express its assessment in terms of a percentage rate. Accordingly, we affirm the judgment of the Superior Court.

The entry is:

Judgment affirmed.

---

4. By contrast, as discussed above, subsection 4, addressing the assessment against self-insured employers, was amended to add the following sentence: "This assessment [against self-insured employers] must be a dollar amount." P.L. 1995, ch. 59, § 2.